## BENEVOLENT & PROTECTIVE ORDER OF ELKS, LODGE NO. 151 v. CITY OF HOUSTON.

### No. 2114.

Court of Civil Appeals of Texas. Beaumont. Dec. 1, 1931.

Rehearing Denied Dec. 31, 1931.

N. B. Brunson, Sewall Myer, and A. C. Winborn, all of Houston, for appellant.

Sam Neathery and Rodman S. Cosby, both of Houston, for appellee.

O'QUINN, J.

May 1, 1930, appellant, Houston Lodge No. 151, Benevolent & Protective Order of Elks, instituted this suit in the district court of Harris county, Tex., against the city of Houston and certain of its officials, wherein appellant prayed for an injunction enjoining said city and its officials from levying and collecting city and school taxes against the property of said lodge, and asking that said city and officials be perpetually enjoined from collecting such taxes, and that appellant be decreed to be a purely public charitable institution exempt from taxation under the Constitution and laws of the state of Texas. The city of Houston answered by general demurrer, general denial, and specially denied that Houston Lodge No. 151, Benevolent & Protective Order of Elks, was a purely charitable institution, but affirmatively alleged same was predominantly a social organization, and that the dispensing of charity was only a small incident connected with its purposes and practices, and alleged that its property was not used entirely for such purposes, but that others were permitted to use, and did use, the property of said institution for private profit, no part of which profits were used for charitable purposes.

On November 3, 1930, upon a full hearing, the court entered its decree denying appellant the injunctive relief prayed for. From that judgment this appeal was taken.

The appellant, Houston Lodge No. 151, Benevolent & Protective Order of Elks, is a subordinate to the Grand Lodge of the Benevolent & Protective Order of Elks of the United States.

The preamble to the 1929-1930 constitution and statutes of said order reads: "To inculcate the principles of charity, justice, brotherly love and fidelity; to promote the welfare and enhance the happiness of its members; to quicken the spirit of American patriotism; to cultivate good fellowship; to perpetuate itself as a fraternal organization, and to provide for its government, the Benevolent and Protective Order of Elks of the United States of America ordains this Constitution."

Section No. 1 of article No. 1 of the constitution of appellant order is: "This Constitution, the statutes enacted by the Grand Lodge not in conflict therewith and the ritual, with the instructions therein contained, shall be the supreme law of the Order."

The following, pertaining to the conduct of the said organization, was introduced in evidence:

"Club Rule No. 4.

"Upon application by a member to the Secretary, a visiting card will be issued to any female member of his immediate family, which card shall, as long as said member is in good standing, entitle the recipient to the privilege of the club.

"Article 10.

"Fees & Dues.

"Sec. 1. The fee for initiation in this Lodge shall be fifty dollars, twenty-five must accompany the proposition; and the balance must be paid when the candidate presents himself for initiation.

"Sec. 2. The regular lodge dues shall be $12.00 per annum, payable semi-annually in advance on the first days of April and October in each year.

"Sec. 3. No fees shall be charged for affiliation, provided, however, that if the initiation fee of the lodge granting a demit to the applicant for affiliation is less than the initiation fee of this lodge, the applicant must pay at least the difference in the initiation fees of the two lodges.

"Sec. 4. The fee for reinstatements in cases where more than a year has elapsed between striking from the roll and application for reinstatement, shall in every case be the amount of dues owed by the applicant when stricken from the roll, not exceeding two years' dues.

"Sec. 5. The dues of any member who is sick or in distress may be remitted by majority vote of the lodge.

"Sec. 6. All dues from members shall be paid to the Secretary in person, or transmitted to him in registered letter, or by postal note, money order, or check, payable to his order, and the Secretary shall immediately acknowledge the receipt of the same.

"Article 11.

"Help.

"Sec. 1. All applications for help shall be referred to the standing relief committee, who shall recommend relief according to the circumstances of the case.

"Sec. 2. When a worthy Elk of this Lodge is destitute, unable to procure employment after diligent efforts, and actually without the necessities of life, he may make application in writing to the Lodge, or during the intervals between the sessions of the Lodge, to the standing relief committee (named in the Grand Lodge Statutes); and may, if found worthy, be assisted from the funds of the Lodge to a sufficient extent to provide him with the necessaries only.

"Sec. 3. When a worthy Elk of this Lodge is in the condition described in the second section of this Article, and in addition thereto is sick and in need of proper medicines, he may be provided with the same by the standing relief committee, and in addition thereto be provided with necessary medical attendants."

This appeal presents but one question, and that is whether appellant is an institution of purely public charity within the meaning of section 2, art. 8, of our state Constitution.

If it is, it is entitled to the relief it seeks, but, if it is not an institution of purely public charity, although it devotes much of its time, energy, and resources to charity, a part of which is for the benefit of its membership and the balance for the public in general, it cannot have the relief prayed for.

S. W. O'Bryan, exalted ruler of appellant lodge, testified:

"The affairs of the Lodge are handled by a Board of Trustees. * * * The character of building located on this property that is involved in this suit is at the corner of Walker and Crawford Streets in the City of Houston. It is a three-story building, with a lodge room, gymnasium, class rooms, offices and so on. The building is used for the purposes for which we obtained it. It is used for the activities of the lodge. It is used exclusively by the Benevolent and Protective Order of Elks, Lodge No. 151. This building contains lodge rooms, club rooms, a bowling alley, a restaurant, billiard and card tables, a library, a reading room, a natatorium and a barbershop. It also contains the office of the Secretary.

"The different portions of this building are used by the members and employees for the benefit of the organization. * * * We have certain employees around the building to keep the building in order. They wait on the members and do other things like any other organization of that kind with those facilities would have. * * * The revenue that goes to support the institution and the lodge and other necessaries of the organization is from dues paid in by the members from donations by members and received from charity entertainments. We also get some from the bowling alleys and other facilities. We also get some money from some other properties that has been willed to the Order. We get a royalty, as I understand, in oil land at Pierce Junction, that is for charity and cannot be used for anything else. That was left to the Order by a man named Duke and goes into the Order for charity only.

"With reference to your question as to what does the Elks Lodge do with its revenue; my answer is they first have to maintain that property and pay interest and expenses on the building, they still owe some amount on it, pay the employees for their duties, and the balance goes into the charity fund. We pay the operating expenses out of it, we pay the interest and the principal on the building out of it. We pay for the maintenance and upkeep of the property out of the revenue. The balance of it goes to charity. We do not lease out any portion of this property for profit, we do not have a restaurant there, it is a buffet. We do not lease that out, that is exclusively for the convenience and use of the members of the Lodge. We have a barbershop, we do not rent that out. That is also used exclusively for the benefit of the members. There is no other organization except the Benevolent and Protective Order of Elks No. 151 that uses this property or that has any interest in it. This Lodge is not conducted for any private gain or profit to anybody."

In answering as to what character of charity the Elks Lodge practiced, he said: "The Elks Lodge practices in all cases of charity whatever at present. I do not know any worthy cases that has been turned down. For instance, the Elks Lodge has, for the past three or four years, had a little girl, a ward, they took out of the Faith Home three or four years ago, has supported her, bought her clothes, sent her entirely through school, she graduated last year, and we are now putting her through business college, giving her a stenographic course and a business education, and when that is completed will obtain a position for her. Another time, several of the brothers were on a fishing trip on the Bernard River several months ago and happened upon a family in very destitute circumstances. The woman was hobbling around with her leg cut off and with one crutch, and two small babies; they brought that woman to Houston and provided her with an artificial limb, paid her expenses while she was here; there is also the Christmas charity where they provide Christmas baskets for the poor and needy."

Relative to assisting people who are poor and sick, and need medicine and hospital attention, he testified: "Those are daily occurrences and we take care of all of them, regardless of race, creed or color. We do not turn down any charity that is worthy, so far as our revenue will permit. It is a daily occurrence for our lodge to administer charity for someone. Their race, creed, religion, nor color has anything whatever to do with it. We administer to Negroes. We administer to people of all races and creeds. * * * I know we administered to all cases coming to us, all of the revenue and money over the amount of our expenses goes into the Charity Fund. We provide food, clothing for people at times when they need it. * * * Organizations like the Y. M. C. A. and the Social Service Bureau send cases over there that they know to be worthy, or think they are. We provide for them."

Relative to the method of administering the charity, he testified: "The Exalted Ruler appoints the committee for the purpose of inquiring into charity cases to find out if they are needy and they report back to the Secretary and he takes care of that, and it is done with as little publicity as possible. This committee is not paid and receives no compensation whatever."

Relative to whether the charity dispensed applied only to the local lodge or the state and national organization, he said: "Charity is the keystone to all Elks organizations, the

State organizations have a plan to help the underprivileged children and other forms of charity. All of their revenues outside of actual expenses is donated to charity. The national grand lodge has a twenty million dollar foundation fund, the revenue of which goes altogether for charity, it is never touched for anything else, not even for administration."

He further testified: "Our revenue at this time is large enough to pay our operating expenses, the notes on the building, and still have some money for charity. If our Lodge is exempted from taxation, that money will be put into the charity fund, it will be that much more for charity. It will all go to charity. * * * We have a committee called the Welfare Committee—they have an employment department where they receive applications and employers communicate with them and so far, during this depression, they have gotten quite a few of them located. Those services are absolutely free of charge. We do some charity every Christmas; we have a Christmas tree for the poor children and send our hundreds of baskets to the poor families. We educate and help maintain orphans. Whenever there is a great calamity occurs, such as a flood, we contribute to that. This charity work is done from and in our building over there altogether. The charity work is done directly by ourselves."

He further testified: "The Elks Lodge never pays any dividends or anything like that. The 'B' stands for Benevolent."

He says the Elks Lodge is not predominately social: "We have social activities in connection with our lodge. We do that to attract the members if we do not we do not have any members, consequently would not have any charity. We go in for a great deal of social activities, or enough to keep the members interested. * * * The money we derive from charity dances, and things of that kind, goes into the charity fund. No part of that goes into the operating expenses. The Elks magazine * * * produces profit, each year, and that profit is devoted exclusively to charity, the proceeds for two years went to establish the Elks Memorial in Chicago for the Soldiers killed during the world war, the finest that has ever been constructed."

On cross-examination he testified: "The Houston Lodge, No. 151, of the Benevolent and Protective Order of the Elks, is a subordinate lodge and is a secret organization. We have a secret ritual. We charge an initiation fee, at the present time it is $30.00. It has been that same price since we moved into the new building. We have annual dues, payable semi-annually, in April and October. Those dues are $6.00 every six months. It is $1.00 per month for each member. It is a fact that membership in the lodge of Elks can only be had after a man's name is presented and voted on by the membership at a regular meeting. After he is elected, it takes three blackballs to refuse him. No person can be admitted to the lodge unless he has been elected to membership. He can then only be admitted on payment of the initiation fee of $30.00, payable in advance of initiation. He can only then be admitted to the lodge rooms after he has paid his dues in advance and has gotten his membership card. * * * The Houston lodge No. 151 has something over 2,000 members. We receive, in round numbers, $24,000.00 per year in dues. * * * We maintain in this building card tables. Cards are played there during the day and during the hours the club is open. We close the club at twelve o'clock at night, I think. It is open at noon; from noon until twelve o'clock at night, cards are played at the card tables. We have domino tables also. Dominoes are played from twelve noon until midnight. We also have checker tables. They play checkers from twelve noon until twelve midnight if they want to. We also have billiard tables there; they play billiards from twelve noon to twelve midnight every day if they want to. The lodge room is kept open on Sundays. Billiards and cards are played on Sunday. Dominoes and checkers are also played. We have a pool table; pool is played. We do not make a charge for cues or billiards or pool or dominoes or on the checker tables. We also have a bowling alley. Bowling is indulged in at such time as the members see fit from twelve noon until midnight. We charge a fee for the bowling alley, we charge 15¢ a game and 5¢ goes to the boy who sets up the pins then the rest goes into the treasury of the lodge. We have a gymnasium there. We have lockers. We charge $4.00 per year locker fees. We do not charge any other gymnasium fees. We have a gymnasium instructor. I think he sells equipment there, I think he has a stock of his own, the lodge has nothing. He has a stock of his own that he sells to members who want to indulge in gymnasium exercises. It is gym clothing. The lodge provides the equipment. He sells gymnasium clothing and shoes and things of that kind. He owns all of that, he owns all of that clothing, the lodge has nothing to do with selling that. We pay him a salary as gymnasium instructor. We pay him $200.00 per month."

He further testified: "We have a barbershop in the building. The man who runs the barbershop gets all he takes in. He shaves and cuts the hair of all the members that come there, but there is no visitors that come there. No one unless he is a member of the Order. The member cannot bring a guest in there, not even in the barbershop. You cannot bring a guest in there unless he was a member of the Elks lodge unless someone might come through the place. No visitor can indulge in the games. There has been no visitors that has played a game with any mem-

ber, not to my knowledge. If they do, they slip in. I mean to say that a guest cannot be taken in there and play a game of dominoes or checkers with any of the members, if they do that its against the rules. There is only one barber in the barbershop. I think they have one shine boy there. They get all the money they take in off of shoe shines. The barber gets all the money he takes in on shaving and cutting the hair. The barbershop is not rented. The barber furnishes his own towels and we do not have any contract with the barber. We have no written contracts at all. The barber furnishes his own razors and scissors. We do not have a manicurist in there. The barber furnishes all of his own equipment. He does not furnish the chairs, the lodge owns that. The lodge pays the water bill."

He further testified: "We have a restaurant in that building. It is run by a man named McKinnon. He is on a salary, but not for running the restaurant. He gets all the profit he makes, out of running the restaurant. He keeps that. He furnishes the food. He buys that. He sells it to the members and keeps all he makes out of it. * * * He sells sandwiches and other things to eat. He sells lunches and brings them to the table and serves them. We have a cold drink stand where they keep near beer and coke is sold. They keep a few bottles there. * * * He keeps all he wants when members call for it. He sells Budweiser and Schlitz and Dr. Pepper and various cold drinks in bottles. He does not get all the profits he makes on that, the lodge gets that. * * * He is paid for that, that is a part of his duties. He runs the lunch stand separate and gets the profits. The lodge gets the profits on the cold drinks. The lodge buys and sells the cold drinks. They buy and sell it for a profit. We do not get anything for the use of that space of the barbershop, he gets that free. He gets all the profits he makes. We do not get anything for the space used by the restaurant man, he gets all of the profits. We get the profits from the cold drinks that he sells."

He further testified: "We have a man to give Turkish and electric baths. He does not pay anything for that privilege, down there. He gets all the money he makes on that. He furnishes the towels and the liniment and the rubbing material. He does not have any help in the way of Negroes that work there that I know of. He furnishes all the material such as the towels and rubbing material."

He testified that they paid their secretary $300 per month and manager $150 per month, and that they had a number of porters and other employees that looked after the bowling tables, checker tables, domino and card tables, and the building generally, that were paid approximately $15 per week. He said

that none of the initiation fees went to the Grand Lodge in the shape of per capita tax, but that each member was assessed 35 cents against each member for Grand Lodge purposes, and that it was obligatory upon each member to subscribe $1 per year for the magazine. He further testified: "We do raise charity funds by voluntary contributions. We also hold, on an average of once a year, a dance known as a charity dance. * * * The profits from that goes into the charity fund. The voluntary contributions of the membership now goes into the charity fund. That is dispensed for various kinds of charity. We frequently have dances during the year, social dances. Visitors are not invited to that dance unless they are members of the Order or members of a brother's family. We cannot invite outsiders to the dance. * * * We have a smoker once in a while. The members pay for that. It is a kind of dutch treat proposition, each one pays for it, it is a dutch treat. Each fellow pays so much for a contribution to it. Sometimes we have eats and smokes, and sometimes other things."

In answer to the question whether the organization with its billiard tables, domino tables, pool tables, bowling alleys, barbershop, gymnasium with gymnasium instructor, and with all those things they have down there, was the organization not predominantly social, he answered, "It is not."

Courtney Hutcheson, witness for defendant, testified: "I am secretary of the Benevolent and Protective Order of Elks Lodge, No. 151, of the United States of America, the Houston lodge. I have held the position of Secretary about ten years. The books showing the receipts and disbursements are kept in my office under my supervision. It is part of my duties as Secretary to keep these books and accounts. I have one assistant employee to help me. Her name is Mrs. W. J. Hutt. She has been employed as my assistant for five years. She is paid by the Lodge. She gets a salary of $125.00 a month, I get a salary of $300.00 per month. * * * During the past year the Houston Lodge No. 151 took in from dues and initiations, about $39,000.00. * * * There is paid out in salaries each year, including my salary, Mrs. Hutt's salary, the janitors and porters and all the parties whose salaries are paid by the organization, would run around $10,000.00, that is substantially correct, it will run better than that, around $11,000.00 in salaries."

He further testified: "There is 1.35 of the money collected sent to the Grand Lodge. The total net receipts out of each member that is retained here is $12.00 per year, and we have about 2,000 members, and that would be $24,000.00 per year if it is collected. We have now about $3,000.00 outstanding for the past year. We only collected about $25,000.00. * * * The gross from all sources, that we

took in last year, was about $39,000.00. That covers the initiation and the dues. * * * That is all the money we collected from all sources, dues and initiation."

Relative to the gymnasium, he testified: "We have some showers down there. We have electric baths down there, but that is not operated by us. We do not furnish any of the equipment for that. The man who operates furnishes that. He gets all of the profits. I do not know what he does with the profits, he conducts his own business in there."

He further testified: "The man who runs the buffet. The man who gives the electric baths is not a member of the Order. The man who runs the buffet gets the profits on that. We furnish him a place to conduct this private business. My books here show every cent of money that went into the charity fund. The amount of money paid into this charity fund during the last fiscal year was $7,880.72, that was all the money that was paid into the charity fund. The amounts of money we realized from the charity balls during the past fiscal year was $1,240.35. That was part of the $7,800.00. We did not realize very much from any of the other dances that went into the charity fund, I expect about $200.00. The amount of money we realized from voluntary contributions that went into the charity fund will run around $4,000.00."

He further testified that it was a fact that no part of that fund came out of the dues.

■ Whether appellant is a "purely charitable institution" is one of fact. Only two witnesses testified, and we have set out above practically all of their testimony that we deem pertinent and bearing on the issue.

Section 2 of article 8 of the Constitution, after enumerating various properties that the Legislature might by general laws exempt from taxation, concludes: "And institutions of purely public charity; and all laws, exempting property from taxation other than the property above mentioned shall be null and void."

Article 7150, R. S. 1925 (as amended [Vernon's Ann. Civ. St. art. 7150]), was enacted to give effect to the above provision of the Constitution. Is appellant an institution of purely public charity, within and under the terms and intent of the Constitution?

In the above constitutional provision, the word "purely" is intended to modify the word "charity" and not the word "public," so as to require the institution to have a wholly altruistic quality and exclude from it every private or selfish interest or profit or corporate gain. City of Houston v. S. R. B. Ass'n, 111 Tex. 191, 230 S. W. 978. In law, the word "purely" is used in the sense of and the equivalent to "only," "wholly," "exclusively," "completely," "entirely," and "unqualifiedly." 51

C. J. 100. Therefore, for an institution to be one of "purely public charity," it must be one whose property is used wholly and exclusively for charitable purposes. The words "purely public charity" have many times been used in the Constitution and statutes of other jurisdictions, and have uniformly been interpreted to mean "a charity free from mixture or combination; one unalloyed with other purposes and objects." 51 C. J. 100.

■ From a careful consideration of the record, we have concluded that appellant is not, within the intent of the law, an institution of purely public charity, because:

(a) It appears to us that the object to be attained by it is not wholly altruistic, but that the prime object of the organization is social. It is a secret fraternal organization with a secret ritual. Its members are carefully selected, and the favors and pleasures of the lodge are confined to its membership, so much so that outside visitors may not even, by invitation of a member, participate in the many social activities there carried on. Its pool and billiard tables, card tables, domino tables, checker tables, barbershop, restaurant, cold drink stand, gymnasium, natatorium, electric baths, bowling alleys, and other features, are for the pleasure and convenience of its members only. The use of these means of social contacts are open to the membership from twelve noon to twelve midnight seven days in the week. And it further appears that many social dances—not charity dances, but dances for the entertainment and pleasure of the membership of the Lodge and the lady members of their families—are had in the building each year. Exalted Ruler O'Bryan testified: "We go in for a great deal of social activity, or enough to keep the members interested."

If these social features were absent, we question whether the order would carry on. We think that the record reflects that the gain in social pleasures and contacts provided for, growing out of and practiced by the organization, form the chief consideration for its existence. "A building used as the headquarters of a lodge or a fraternal order of a charitable character is not exempt if one of the dominant uses of the building is for the social enjoyment of the membership, since such a building, in its legal aspect, is no different from the clubhouse of an ordinary social club." 26 R. C. L. 319. The many admirable acts of charity done by the organization are to be commended, but do they constitute the only, or the whole, purpose of the institution? Is not the charity feature but an incident to the whole?

(b) Under the law, for the property of appellant to be exempt from taxation, it must not only be owned, but also be used exclusively, by an institution of purely public charity. Is it so used here? The barber-

shop is operated by one who gets all the income. He pays no rent, but he gets free space to operate his trade, and retains for himself all the income. The man who runs the gymnasium is a paid instructor. He not only receives $200 a month as instructor, but he keeps in the gymnasium his own stock of supplies and sells them to the members, has free space, and retains the whole of the income for his own use. The man who runs the restaurant also keeps and furnishes all his supplies and retains all the income. He shares in the use of space free of rent. The man who gives electric baths furnishes the towels and rubbing liniments and keeps all the income. He pays nothing for the space he uses. The witness Hutcheson, appellant's secretary, testified: "We have some showers down there. We have electric baths down there, but that is not operated by us. We do not furnish any of the equipment for that. The man who operates furnishes that. He gets all the profits. I do not know what he does with the profits, he conducts his own business in there. The man who gives the electric baths is not a member of the Order. The man who runs the buffet gets profits on that. We furnish him a place to conduct this private business."

The fact that the restaurant keeper, barber, gymnasium operator, and electric bath giver do not pay rent for the space used by them to carry on their business is not enough to satisfy the constitutional requirement that the property must be used exclusively by the institution. The use required by the Constitution of the institution must be actual, direct, and exclusive. Red v. Johnson, 53 Tex. 288; City of Houston v. S. R. B. Ass'n, 111 Tex. 191, 230 S. W. 978; Masonic Temple Ass'n v. Amarillo Independent School District (Tex. Civ. App.) 14 S.W.(2d) 128 (writ refused); St. Louis Lodge No. 9, B. P. O. E. v. Koeln, 262 Mo. 444, 171 S. W. 329, L. R. A. 1915C, 694, Ann. Cas. 1916E, 784; Benevolent Ass'n of Elks v. Wintersmith, 204 Ky. 20, 263 S. W. 670. So it appears that the use of the property in question by appellant is not exclusive. While it is true that each of the activities above mentioned is carried on for the personal pleasure, comfort, and convenience of the members of the order, yet the persons operating same use a portion of the space in the building to carry on their private and personal business, receiving and keeping the whole of the income therefrom.

Exemptions from taxation are not favored, and the law allowing exemptions should be given a strict interpretation. It is the policy of the state, and but justice between its citizens, that all property should be taxed, and that no property shall escape this common burden, unless it comes clearly within the exemption, and it was incum-

bent on the appellant to show that it comes within the exemption clauses of the Constitution and the statute. We do not think this has been shown.

The judgment of the trial court should be affirmed, and it is so ordered.

Affirmed.