**ARANSAS HOSPITAL, INC., Appellant,**

v.

**ARANSAS PASS INDEPENDENT SCHOOL DISTRICT et al., Appellees.**

No. 940.

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1975.

Rehearing Denied April 24, 1975.

Lola L. Bonner, Rockport, for appellant.

Thomas M. Andrews, Ellis & Andrews, Aransas Pass, for appellee Aransas Pass Independent School Dist.

Dale Linebarger, Gates Steen & Associates, Austin, for appellee City of Aransas Pass.

## OPINION

BISSETT, Justice.

The sole question presented by this appeal is whether or not the appellant is an institution of purely public charity.

Aransas Pass Independent School District filed suit to foreclose its alleged tax liens for the year 1966 through 1972 against Aransas Hospital, Inc. Other taxing agencies were impleaded. The City of Aransas Pass, an impleaded defendant, by proper pleading, asked that its alleged tax liens for the same years be foreclosed. The defendant in its answer plead that it was a charitable institution within the meaning of Article VIII, § 2 Tex.Const., Vernon's Ann.St. and Art. 7150, § 7, Vernon's Tex.Rev.Civ.Stat.Ann. (1960), and that therefore it was exempt from ad valorem property taxation. Trial was to the court without the aid of a jury. Judgment was rendered which foreclosed the tax liens asserted by the School District and by the City on certain properties owned by Aransas Hospital, Inc. An appeal has been duly perfected from that judgment by Aransas Hospital, Inc. The Aransas Pass Independent School District and the City of Aransas Pass will henceforth be referred to as "appellees", and the Aransas Hospital, Inc. will be referred to as either "appellant" or "the Hospital".

The trial court, in the judgment, found that there were delinquent taxes owing to appellees ($6,849.55 to the School District and $4,779.37 to the City) and concluded that they should have judgment for the taxes owing them on the properties described therein. No other (formal) findings of fact or conclusions of law appear in the record.

The appellant is a Texas Corporation and was chartered on July 22, 1953, as a

non-profit corporation. Appellant's properties were not on the tax roll of any taxing agency from 1953 through 1965. Its properties were first placed on the tax rolls of appellees for the year beginning January 1, 1966, and have been carried on those rolls continuously since that date. Its properties did not, at the time of trial, (May, 1973), appear on the tax rolls of any other taxing agency in San Patricio County, the county where its properties are located and situated.

It was stipulated: no corporate stock was ever issued and no dividends have ever been paid to anyone; appellant corporation is a non-profit organization and does not pay a franchise tax to the State of Texas; the Internal Revenue Service has recognized appellant as a non-profit organization.

The purpose clause in the Articles of Incorporation recites:

"Said corporation is formed for benevolent and charitable purposes and especially for the erection or purchase, and maintenance and operation of a hospital in the City of Aransas Pass, Texas for administering to the sick, infirm, affected, and needy and to alleviate their pain and suffering and to restore them as far as possible to health".

The original By-Laws, which were adopted on October 1, 1953, were superseded by By-Laws which were adopted on March 18, 1966. The purposes of the appellant corporation were stated in the newly adopted By-Laws in these words:

"A. To establish and maintain a hospital for the care of people suffering illness or disabilities requiring in-patient or out-patient facilities.

B. To participate, so far as the circumstances may warrant, in any activity to promote the general health of the community.

C. To carry on educational programs, including the training of healing arts personnel, relating to rendering care to the sick or the promotion of health and the maintenance of high hospital standards, as directed by the Board of Trustees."

The 1966 By-Laws, which were in effect at the time of trial, insofar as they pertain to this appeal, further:

(1) created an open membership;

(2) provided for annual and special meetings of the membership;

(3) provided that trustees (9) be elected at annual meetings of the membership;

(4) provided that vacancies on the Board of Trustees be filled by appointment by the remaining members of the Board of a person who will hold office for the remainder of the unexpired term of the vacating trustee;

(5) directed the Board of Trustees to appoint an active medical staff composed of osteopathic physicians (and dentists);

(6) authorized the adoption by the medical staff of By-Laws, and provided that such By-Laws of the medical staff, as approved by the Board of Trustees, shall become part of the By-Laws of "The Aransas Pass Hospital, Incorporated".

By-Laws of the "Active Staff of the Aransas Hospital, Inc.", subsequently passed and adopted, created a membership that was open to any applicant who is "a graduate of a recognized school of osteopathy, medicine, or dentistry, licensed to practice his profession in the State of Texas . . ." Under Article II of such By-Laws, it was stated:

"The objectives of this association shall be to promote the public health, and the art and science of the osteopathic school of practice of the healing art;

By maintaining high standards of osteopathic education and by advancing the profession's knowledge of surgery, ob-

stetrics, and the prevention diagnosis and treatment of disease in general;

By stimulating original research and investigation; and by collecting and disseminating the results of such work for the education and improvement of the profession and the ultimate benefit of humanity."

Although there is no evidence that the By-Laws of the medical staff were formally approved by the Board of Trustees of the Hospital, the record reasonably supports an inference that they were duly approved by such Board. We consider the By-Laws of the active medical staff to be part of the By-Laws of the appellant corporation.

Admission of patients to the Hospital are made only by a member of the active medical staff of the Hospital. Each member of that staff must be a duly licensed and practicing doctor of osteopathy (or dentist). Dentists admitted to staff membership are allowed the use of hospital facilities only under the direct supervision of an active medical staff doctor. There also exists a "general staff", which includes all members of the "active medical staff", three allopathic doctors (M.Ds.) who serve as pathologists, and one allopathic doctor who serves as a radiologist.

The Hospital is open to the public, and for the most part draws its patients from the active medical staff doctors who practice in the Hospital. The charity patients, according to appellant, include tourists, shrimpers, victims of highway accidents, those needing emergency treatment for various reasons, persons brought there by Law Enforcement Officers, and individuals sent there by the San Patricio County Welfare Department. When persons who are not patients of a doctor on the active medical staff of the Hospital appear for admission, whether at the admission desk or in the emergency room, the active medical staff doctor (who is on call under a rotating system) is asked to determine whether admission is required as a matter of medical necessity. If it is determined that the person does need hospitalization, then one of the staff doctors contacts the person's own doctor before that person is admitted as a patient. Such a person will not be admitted to the Hospital *unless* the admission is first authorized by one of the doctors on the active medical staff. However, no person has ever been denied admission to the Hospital because of poverty or inability to pay for hospital care and services.

Article VIII, § 2, of our State Constitution provides, in part, that the legislature may, by general law, exempt certain property from taxation, including all buildings used exclusively and owned by institutions of purely public charity. Art. 7150, Tex. Rev.Civ.Stat.Ann. (1960), the implementing legislative enactment, reads in part, as follows:

"7. Public Charities.— . . . An institution of purely public charity under this article is one which dispenses its aid to its members and others in sickness or distress, or at death, without regard to poverty or riches of the recipient . . . ."

It is well settled that an organization is not an "institution of purely public charity" within the constitutional and statutory tax definition unless the organization: 1) makes no gain or profit; 2) accomplishes ends wholly benevolent; and 3) benefits persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity, from becoming burdens to society and to the state. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., 426 S.W.2d 943 (Tex.Sup.1968); River Oaks Garden Club v. City of Houston, 370 S.W.2d 851 (Tex.Sup.1963); City of Houston v. Scottish Rite Benev. Ass'n, 111 Tex. 191, 230 S.W. 978 (1921); Santa Rosa Infirmary v. City of San Antonio, 259 S.W. 926 (Tex.Comm'n App.1924, judgm. adopted).

■ Exemptions from taxation are never favored, and in construing laws exempting an organization, all doubts are resolved against the exemption. Morris v. Lone Star Chapter No. 6, Royal Arch Masons, 68 Tex. 698, 5 S.W. 519 (1887); Methodist River Oaks Apartments v. City of Waco, 409 S.W.2d 485 (Tex.Civ.App.—Waco 1966, writ ref'd n. r. e., 389 U.S. 848, 88 S.Ct. 75, 19 L.Ed.2d 117).

■ Whether an organization is a "purely charitable institution" so as to entitle its property to a tax exemption is a question of fact. The burden of proof is on the organization claiming the exemption to show by facts that it comes clearly within the constitution and statutory exemption. Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist., supra; Methodist River Oaks Apartments v. City of Waco, supra; Malone-Hogan Hospital Clinic Foundation v. City of Big Spring, 288 S.W.2d 550 (Tex. Civ.App.—Eastland 1956, writ ref'd n. r. e.).

■ According to Mr. Burge, the Hospital's administrator (who has held that office since January 1, 1971), the Board of Trustees had never defined a "charitable". patient for the administrative personnel of the Hospital. There is no evidence that the Board, the general staff, or the active medical staff, ever made a determination as to what constituted a "charitable" patient. In the opinion of Mr. Burge, a "charitable" patient is a person who is admitted to the hospital when the admitting staff doctor knows that the patient does not have any money. All patients were charged by the Hospital with all services furnished and rendered, and they were regularly and systematically billed therefor.

There is evidence that the gross receipts of the Hospital from 1968 up until time of trial (5 years) averaged about $230,000.00 per year. The testimony and exhibits, totalling more than 1100 pages, reveal that for the years 1968 through 1972: 1) gross receipts amounted to approximately $1,150,-000.00; 2) a total of 4,040 persons were admitted as patients; 3) of the 4,040 admissions, 78 were classified by the Hospital's administrative personnel as "charitable" patients; 4) the total hospital charges made to the 78 patients amounted to $14,200.88; 5) of those 78 patients, 5 paid a total of $1,338.90 to the Hospital leaving a balance due of $12,861.90; and 6) the 78 patients were all treated by doctors who were on the active medical staff of the Hospital. There is also evidence that the treating doctors made charges to 31 of the 78 patients in the total sum of $6,478.00, and 22 of those patients paid the doctors $3,361.45, leaving a balance due of $3,116.55. None of the 5 patients who made partial payments on the Hospital's bills are among the 22 who paid part of their bills to the doctors, and vice versa.

The record reveals four intances where the Hospital furnished services that undoubtedly were purely charitable in nature. Those instances are: 1) following Hurricane Celia in August, 1970, appellant received a temporary hospital "set-up" from the Office of Economic Preparedness and opened a hospital in the Methodist Church building in Aransas Pass, where it operated as a hospital for several weeks, and for a period of about two weeks following the Hurricane, made no charge for its services to the persons hospitalized during that interval of time; 2) prior to the invention of disposable syringes, the Hospital furnished sterilized syringes and needles for immunization programs; 3) the membership of the Boy Scouts in Aransas Pass have (for eight years) been given their "camp" physicals at the Hospital by one of the staff doctors, and no charges were made to any of the boys for the use of hospital facilities; and 4) the Hospital's laboratory technician, on several occasions, has taken hospital equipment to the local schools to perform hematocrits for students enrolled in the Head Start Program, and no charges were made by the Hospital for such services, or for the use of its equipment by the technician. The Hospital has, from time

to time, furnished its X-ray equipment at reduced rates for use in examining indigent tubercular patients.

Where the patient had medical insurance, the administrative personnel of the Hospital regularly prepared and transmitted the necessary forms to the insurance company to enable *both* the Hospital and the attending doctor to be paid for their respective services rendered the in-patients who were so insured. Where the patient paid the Hospital in cash for services rendered, the person at the hospital who received the money usually collected for "the doctor's charges if he puts them down". No charge was made by the Hospital to the doctor for the preparation and transmittal of the insurance forms or for such "collections".

It was common practice for the doctors on the active medical staff to use the emergency room facilities at the Hospital "as an after business hours out-patient clinic" in treating their private patients. Nurses on duty assisted the doctors. No charges were made by the Hospital to the attending doctors for the use of the emergency room, its supplies and equipment, or for the assistance by the Hospital's nurses.

In Benevolent & Protective Order of Elks, Lodge No. 151 v. City of Houston, 44 S.W.2d 488 (Tex.Civ.App.—Beaumont 1931, writ ref'd), the Court said that the word "purely", as used in the statute, "is intended to modify the word 'charity' and not the word 'public', so as to require the institution to have a wholly altruistic quality and exclude from it every private or selfish interest or profit or corporate gain". In that case, the organization performed a number of acts that were clearly acts of charity, but the court viewed the charitable acts as being merely incidental to the whole purpose of the organization, and held that the organization was not an *institution of purely public charity.*

■ A case in point is Raymondville Memorial Hospital v. State, 253 S.W.2d 1012 (Tex.Civ.App.—San Antonio 1952, writ ref'd n. r. e.). There, five doctors, who composed the active medical staff of the hospital, were the only doctors whose patients were freely admitted to the hospital. The staff doctors passed upon the fitness of other doctors seeking the admission of patients to the hospital. Patients of non-staff doctors were admitted only upon the association of one of the staff doctors in the case, or under circumstances by which the patient became the patient of the staff doctor. The hospital did some charity work, and always operated at a loss. Four other doctors resided in the area served by the hospital. None of the four doctors requested that they become a part of the staff. The Court denied the hospital's claim to tax exemption because the practices of the hospital under the control of active medical staff resulted in indirect personal profits and special benefits to the staff doctors by way of decreased expenses and increased revenues. The same reasons exist for denying tax exemption in the case at bar.

Here, the active medical staff, in fact, controlled the operation of the Hospital and dominated its policies. There has never been an annual or special meeting of the membership, and there is no evidence that an open membership is in actual existence. None of the trustees were ever elected by the membership. The doctor who was chief of the active medical staff in 1971 agreed that in his judgment the By-Laws of the active medical staff have had a "limited effect on the openness of the staff." The use of the emergency room after normal office hours by the active medical staff for treatment of their private patients, the assistance by the Hospital's nurses at those times, the collection of doctor's fees by Hospital personnel from the patients who paid their hospital bills in cash, and the preparation and transmittal of insurance forms by the administrative personnel of the Hospital for the benefit of the active medical staff, all without charge to the doctors, operated to decrease

expenses and increase revenues of the particular doctor assisted. The logic and holding of the Court in the Raymondville Memorial Hospital case, supra, is applicable to the instant case.

There are other reasons why the trial court's judgment should be affirmed. The Hospital does not accomplish things wholly benevolent. The actions of the Hospital do not meet the standards imposed by our Supreme Court in resolving the issue presented by this appeal. The Board of Trustees of the appellant corporation did not exercise exclusive control over admission policies, never developed a program designed to render purely public charitable services to the community which it was supposed to serve, and delegated all of its authority relating to the admission of patients to the members of the active medical staff of the Hospital, who profited personally by the use of Hospital facilities.

Percentagewise, when the total of the charitable patients claimed by appellant to have been admitted during the aforesaid five-year period is divided into the total admissions during that same interval of time, the claimed charitable patients constitute only 1.9% of the total admissions. Dollarwise, the unpaid balance due the Hospital by the alleged charitable patients is no more than about 1% of the gross receipts received by the Hospital.

■ There is no evidence that any person was ever admitted as a charity patient pursuant to a policy promulgated by the Board of Trustees, the governing body of the Hospital. The four instances where the Hospital did render services that were purely charitable in nature and in scope, while highly commendable, do not, as such, qualify appellant for tax exemption. Isolated and occasional acts, of charity are insufficient to show that society's burden in caring for the indigent has been materially reduced.

The By-Laws which were adopted by the Board of Trustees on March 18, 1966, the By-Laws which were thereafter adopted by the active medical staff, and the use made by the active medical staff of the Hospital's premises and personnel in matters incidental to their private practice, support an implied finding that the hospital, regardless of the purposes stated in its Articles of Incorporation, was not being operated as a hospital that assumed to a material extent burdens which might otherwise fall upon the community which it served. There is not, in this case, a dedication by the Hospital of its properties to charitable uses accompanied by actual use for such purposes.

Viewing the record in its entirety, even though the Hospital operated at a loss, we cannot say that the appellant corporation benefitted persons, indefinite in numbers and in personalities, by preventing them, through absolute gratuity from becoming burdens to society and to the state.

Appellant's point of error which reads: "The trial court erred in finding that the Aransas Hospital, Inc. is not an institution of purely public charity", is overruled.

The judgment of the trial court is affirmed.