BRATTLEBORO RETREAT *v.* TOWN OF BRATTLEBORO ET AL.

Special Term at Rutland, November, 1933.

Present: POWERS, C. J., SLACK, MOULTON, THOMPSON, and GRAHAM, JJ.

Opinion filed May 1, 1934.

230

232

*Stickney, Sargent & Chase* for the plaintiff.

*Frank E. Barber* and *Ernest W. Gibson, Jr.,* for the defendants.

*Lawrence C. Jones,* Attorney General (*E. M. Harvey,* Tax Commissioner, of counsel), for the State.

SLACK, J. This suit involves the validity of taxes assessed against plaintiff on the grand lists of the Town of Brattleboro for the years 1930 and 1931.

The grand list for 1930 includes all real estate acquired by plaintiff since the passage of No. 108 of the Acts of 1858. The taxes assessed thereon were paid by plaintiff, under protest, and suits are now pending in Windham county court against the Town of Brattleboro and the Town School District of

Brattleboro wherein plaintiff is seeking to recover the amount of such tax received by each. The grand list for 1931 includes the real estate above mentioned, certain buildings erected on land acquired by plaintiff prior to the passage of said act, and certain personal property. The taxes assessed on this list have not been paid, but collection of them was threatened at the time these proceedings were commenced. The prayer of the bill is for a temporary injunction restraining defendants from attempting to collect the 1931 taxes until further order of court; that the Town of Brattleboro and the Town School District of Brattleboro be adjudged and decreed to pay to plaintiff such sum as it shall be found each received of the 1930 taxes with interest thereon; and that defendants be permanently enjoined from attempting to levy, assess, or collect any tax on the real or personal estate of the plaintiff.

By agreement of parties the suits pending in Windham county court were transferred to the court of chancery and heard with this case. The State had leave to, and did, enter as party defendant. Each defendant filed an answer, issue was joined thereon, the facts were found by a chancellor, and it was adjudged and decreed that plaintiff pay to the Town of Brattleboro the taxes assessed for the years 1931 and 1932, together with interest and taxable costs. The case is here on plaintiff's appeal and exceptions to the exclusion of certain evidence.

The questions presented for review by the findings are: (1) Is the property defendants are attempting to tax exempt from taxation, in whole or in part, under G. L. 684, subd. VI, and (2) is plaintiff's property exempt from taxation under section 9 of plaintiff's charter? The statute referred to provides that "Real and personal estate granted, sequestered or used for public, pious or charitable uses" shall be exempt from taxation. The material findings are these: One Anna Marsh died in 1834 leaving a will whereby she created a trust fund of $10,000 for the purpose of establishing a hospital for the insane in Windham County. She appointed four men trustees of such fund, and directed that they procure an act of incorporation as soon as might be after her decease. Those men accepted the trust and procured an act of incorporation from the General Assembly in 1834 (No. 46). Section 1 of such act provides that

234

the persons named as trustees in the Marsh will, "and their successors, appointed as hereinafter directed, be, and they hereby are incorporated by the name of 'The Vermont Asylum for the Insane,' with all the powers and privileges incident to such corporations," etc. Section 2 provides:

> "That the said corporation may take and receive, hold, purchase and possess, of and from all persons disposed to aid the benevolent purposes of said institution, any grants and devises of lands and tenements, in fee simple or otherwise, and any donations and bequests, and subscriptions of money or other property, to be used and improved for the erection, support and maintenance of an asylum as aforesaid, provided the income of said corporation from its real and personal estate does not exceed the sum of ten thousand dollars per annum."

Other provisions of the act are that the incorporators and their successors, not to exceed four at any time, shall constitute a board of trustees, who shall have the sole superintendence of the asylum, shall keep, or cause to be kept, accurate books of account of all funds, income, donations, receipts, and expenditures of the corporation which shall at all times be open to the inspection of the board of visitors provided by the act, and shall report annually to the General Assembly the amount of funds of the corporation, its receipts and disbursements, the number of patients admitted and discharged, and any other information necessary to show the effect and operations of the institution; that the "judges" of the court of chancery shall constitute the board of visitors of said asylum, and may visit and inspect the same whenever they think proper, etc., and shall have authority to correct any and all abuses of the trust done or permitted by the corporation or its officers.

Section 9 provides: "The estate, both real and personal, and all other, the funds of said institution, shall at all times hereafter be exempt from all taxes."

Section 10 provides: "Any future legislature shall have power to modify, alter and amend this act, so far as to provide for the more perfect and effectual accomplishment of the objects of this act."

In September, 1835, the trustees named in the act organized the corporation and chose officers thereof. The General Assembly of that year appropriated $10,000 "to enable said trustees the more effectually to promote the benevolent designs of said institution." The following May the corporation purchased the property described in Plaintiff's Exhibit No. 1 upon which its main buildings, Lawton Hall, Tyler Hall, Ripley Nurses' Home, and the new Infirmary now stand, and in December of that year the institution was opened for the reception of patients, and since that time has been, and still is, conducted as a hospital for the care and treatment of insane persons. Prior to the fall of 1858 the corporation had received various appropriations from the State which, including the one above mentioned, amounted to $23,000, a donation from Dr. Rockwell of $400, had acquired real estate valued at approximately $125,000, and its gross income for the year ending July 31, 1859, was $59,433.70. The General Assembly of 1858 passed an act, No. 108, which provided: "Whenever the value of the real estate of the Vermont Asylum for the Insane shall be increased from its present value, by gift, grant, devise, or purchase, such increase shall not be exempt from taxation." This act was approved November 19, 1858, and took effect from its passage.

Thereafter the corporation received other appropriations from the State amounting to $14,000, donations from various sources amounting to $125,548.06, and acquired considerable other real estate. The value of all its real estate in 1932 was $1,018,079 and the value of its personal property was $219,-745.02. Its net income for the year ending June 30, 1930, was $112,236.61, for the year ending June 30, 1931, was $137,379.21, and for the year ending June 30, 1932, was $131,166.36. It has no endowment fund, but derives its income from support of its patients, bequests, and donations. All of its property, both real and personal, has been used for the upkeep and development of its plant, or is intended for those purposes. It receives three classes of patients: Those supported by the State; persons becoming suddenly dangerous to the public and requiring restraint, who are supported by the town from which they are committed, or otherwise; and private patients, who are suffering from some mental or nervous trouble. It has no duty that it must perform toward the public at large,

or any part thereof, except such as results from contract, and no person has the right to be received as a patient at a less price than is agreed to by the trustees, but no person has ever been turned out of the institution because he did not pay as promised. Since 1908, at least, it has cared for an ever-increasing number of State patients, and 367 of its total of 644 in 1932 were of that character. Its pay for such patients has been less than the actual cost of caring for them, not considering returns on capital invested or the expense of the plant, and the standard of care they have received is higher than it could have been if only such patients had been received at the institution.

Pursuant to the right contained in its charter, the corporation in 1892 changed its name to "Brattleboro Retreat," see Act No. 230, Laws 1892, under which name it has since done business.

What constitutes a public charity has been stated recently by this Court. *In re Downer's Estate,* 101 Vt. 167, 142 Atl. 78; *Boyce et al.* v. *Sumner,* 97 Vt. 473, 124 Atl. 853. The distinctive features of a charitable organization, the property of which is exempt from taxation, are that it has no capital stock and no provision for making dividends and profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter, the test being whether it exists to carry out a purpose recognized in law as charitable or whether it is maintained for gain, profit, or private advantage. *Cong. Sunday School & Public Soc.* v. *Board of Review,* 290 Ill. 108, 125 N. E. 7; *New England Sanitarium* v. *Inhabitants of Stoneham,* 205 Mass. 335, 343, 91 N. E. 385; *Comm.* v. *Young Men's Christian Ass'n,* 116 Ky. 711, 76 S. W. 522, 25 Ky. Law Rep. 940, 105 A. S. R. 234; *M. E. Church, South* v. *Hinton,* 92 Tenn. 188, 21 S. W. 321; *Commonwealth* v. *Lynchburgh,* 115 Va. 745, 80 S. E. 589, 50 L. R. A. (N. S.) 1197; *Franklin Square House* v. *Boston,* 188 Mass. 409, 74 N. E. 675; *Contributors to Penn. Hospital* v. *Delaware County,* 169 Pa. 305, 32 Atl. 456.

The plaintiff comes well within this definition except for its large accumulation of property and its income. It was incorporated, organized, and has always been conducted as a hospital for the insane. Its charter does not provide for capital stock and, the contrary not appearing, it will be assumed that

it has none. Its affairs are under the sole management of its board of trustees, subject to the supervisory power of the court of chancery. Neither its trustees nor its officers receive pay, or ever have, for their services, and it is not, and never has been, operated for private advantage, gain, or profit. While its property and income exceed that found in most of the reported cases, assuming, as we do, the contrary not appearing, that the trustees have reported to the General Assembly as required by its charter, the State has at all times been informed respecting its financial status, and any abuse of its trust, done or permitted by its officers, has been subject to correction by the court of chancery. Although it has no duty that it *must* perform toward the public or any part thereof, except such as arises from contract, it has for the last fifteen years, at least, supported a large number of State patients for less than the actual cost to it, and since the expenses of supporting such patients comes from the State revenue, the State and its taxpayers have benefitted to that extent. The fact that none of its patients are cared for without charge does not deprive it of its charitable feature. No one can be admitted to the Columbus Smith Home except upon payment of a fixed admission fee. *Boyce et al.* v. *Sumner, supra.* See, too, *St. Albans Hospital* v. *Town of Enosburg,* 96 Vt. 389, 393, 120 Atl. 97; *Carter* v. *Whitcomb,* 74 N. H. 482, 488, 69 Atl. 779, 17 L. R. A. (N. S.) 733; *Daly's Estate,* 208 Pa. 58, 64, 57 Atl. 180; *County of Hennepin* v. *Brotherhood of Gethsemane,* 27 Minn. 460, 8 N. W. 595, 38 A. R. 298, and cases cited above. Neither does the fact that its charter does not specifically provide for care of patients from within the State affect its character. The charters in the following cases do not appear to have had such a provision: *Daly's Estate, supra; Sailors Snug Harbor* v. *Carmody,* 211 N. Y. 286, 105 N. E. 543; *Kemmerer* v. *Kemmerer,* 233 Ill. 327, 84 N. E. 256, 122 A. S. R. 169; *Eliot's Appeal,* 74 Conn. 586, 51 Atl. 558; *St. Anna's Asylum* v. *New Orleans,* 105 U. S. 362, 26 L. ed. 1128. We think that plaintiff's property is used for a charitable purpose within the meaning of our statute and consequently is exempt from taxation, unless plaintiff has waived the right to now claim such exemption.

 Under its charter plaintiff's right to acquire and hold property was limited to such as did not yield an income in ex-

cess of $10,000 per annum. This limitation the State had the right to make, and plaintiff by accepting its charter assented to it. Having done so, it was bound thereby if the State saw fit to insist upon it through proper legal proceedings, at least in so far as the State had not acquiesced in plaintiff's conduct. Thomp. on Corp. (3rd ed.), vol. 7, par. 5783, and cases cited. But the State alone could interfere. *Williams* v. *Eggleston*, 170 U. S. 304, 42 L. ed. 1047, 18 Sup. Ct. 617; *Cowell* v. *Colorado Springs Co.*, 100 U. S. 55, 25 L. ed. 547; *Fayette Land Co.* v. *Louisville & N. R. R. Co.*, 93 Va. 274, 24 S. E. 1016; *Whitman Gold & Silver Mining Co.* v. *Baker*, 3 Nev. 386; Thomp. on Corp. (3rd ed.), pars. 2867 and 2903, and cases cited; and its failure to do so did not authorize the taxing of plaintiff's property. The State did nothing, as far as appears, until 1858 when the act above quoted was passed. This, it will be noted, was not an attempt to tax anything plaintiff had previously acquired, but only the subsequent increase in the value of plaintiff's real estate resulting from gift, grant, devise, or purchase. In effect, the State then said to plaintiff, you have exceeded the limitation to your property holdings fixed by your charter without interference thus far, but if you increase the present value of your real estate ''by gift, grant, devise or purchase'' you must pay taxes on such increase. This was a proper proposal for the State to make in the circumstances, and if plaintiff accepted it, it is bound thereby and cannot now be heard to claim that such of its property as is otherwise taxable under the act of 1858 is exempt because devoted to a charitable use. *Mayor, etc., of New York* v. *Manhattan Ry. Co.*, 143 N. Y. 1, 19, 37 N. E. 494; *Yates* v. *People*, 207 Ill. 316, 321, 69 N. E. 775; *MacDonald* v. *N. Y., N. H. & H. R. R. Co.*, 23 R. I. 558, 51 Atl. 78; *Penn. R. R. Co.* v. *Duncan*, 111 Pa. 353, 5 Atl. 742; 12 C. J. 1030. The fact that plaintiff was a charitable institution did not legally justify its further acquisition of property in violation of its charter limitation. It did not exist as a matter of right any more than other corporations, but only by sanction of the State. Its powers and limitations, like those of other corporations, are found in its charter and amendments thereto, which if accepted it assented to. Acceptance of the Act of 1858 might result from a compliance with, or acquiescence in its provisions. See cases last cited. If accepted, it must be accepted as made. Plaintiff

could not accept the provisions beneficial to it without obligating itself to perform the conditions imposed. *MacDonald* v. *N. Y., N. H. & H. R. R. Co., supra; Lyons* v. *Orange, A. & M. R. R. Co.,* 32 Md. 18, 29; *United States Bank* v. *Danbridge,* 12 Wheat. 64, 81, 6 L. ed. 552; *Zabriski* v. *Cleveland, etc., R. R. Co.,* 23 How. 381, 16 L. ed. 488. While plaintiff's subsequent acquisition of real estate might tend to show its acceptance, *Mayor, etc., of New York* v. *Manhattan Ry. Co., supra; MacDonald* v. *N. Y., N. H. & H. R. R. Co., supra,* standing alone it would not be sufficient in the circumstance to establish such fact, since in so doing it was simply continuing what it had previously been permitted to do, unmolested. But if it paid taxes on such of its property as was covered by the provisions of that act at least for any considerable length of time, this constituted an acceptance. *Given* v. *Wright,* 117 U. S. 648, 29 L. ed. 1021, 6 Sup. Ct. 907, approved in *N. Y. Elec. Lines Co.* v. *Empire City Subway Co.,* 235 U. S. 179, 194, 59 L. ed. 184, 35 Sup. Ct. 72, Ann. Cas. 1915A, 906; *State, United R. R. & Canal Co.* v. *Comm'r of Railroad Taxation,* 37 N. J. Law, 240; *City of Petersburg* v. *Petersburg R. R. Co.,* 29 Grat. (Va.) 773, and cases cited above, and such property is taxable unless exempt for other reasons.

What has been said respecting plaintiff's acceptance of the 1858 act, and the effect of its doing so, applies with equal force to its claimed exemption under the federal Constitution. It claims that its charter, when accepted and acted upon, constituted a contract between it and the State within the meaning of section 10 of article I of the federal Constitution, and that by the terms thereof its entire property is exempt from taxation, unaffected by the act of 1858. Defendants contend that under plaintiff's charter only such of its property as does not yield an income in excess of $10,000 per annum is exempt; that there was no consideration for its charter and consequently the tax exempt provision was a mere gratuity and subject to future legislation; and that the act of 1858 authorized the laying of the taxes in question. Defendants' first claim is untenable. While the several provisions of plaintiff's charter must be construed together, taken as a whole it is not open to the construction contended for. It is true that tax exemption provisions, whether charter or statutory, must be strictly construed against those claiming the benefit of them, but they are not to

be given a distorted or unreasonable construction. Neither the rapidly increasing demand for public revenue nor the hydraulic pressure of emergency justifies this. Whatever may have been the purpose of the limitation found in section 2 of plaintiff's charter, we are satisfied that it was not intended as a limitation to its tax exemption. Had it been, the Legislature would have provided some means for ascertaining what of its property, real or personal, or both, produced such excess income and was therefore taxable. The Legislature must have contemplated that plaintiff's property would be operated as a whole, and that the income derived from it would result from its being so operated. It is not the excess income that is taxable, but if defendants' theory is correct it is such property as produces such excess. Then, which property is taxable: Its bank stock, Lawton Hall, the Nurses' Home, or the main buildings, the woodland or the tillage? No one can tell. In the absence of any provision attempting to specify what of plaintiff's property should be taxed when its income exceeded the named amount, it seems clear that that limitation has no bearing on the exemption provision. The more logical reason for the presence of the limitation to plaintiff's holdings is that it was to enable the State if and when it saw fit to put an end to plaintiff's acquisition of property through proper legal proceedings for that purpose. This, as we have seen, it might have done.

Neither is defendants' second claim tenable. That the object for which plaintiff was incorporated was such that there is no necessity of looking for a consideration outside of the charter itself is too well established to admit of doubt. *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 519, 644, 4 L. ed. 629; *In re Home of Friendless* v. *Rouse,* 8 Wall. 430, 19 L. ed. 495; *Piqua Branch of State Bank of Ohio* v. *Knoop,* 16 How. 369, 380, 14 L. ed. 977; *Dodge* v. *Woolsey,* 18 How. 331, 15 L. ed. 401; *Mechanics' & Traders' Bank* v. *Debolt,* 18 How. 380, 15 L. ed. 458; *Mobile & Ohio Railroad* v. *Tennessee,* 153 U. S. 486, 38 L. ed. 793, 14 Sup. Ct. 968; Thomp. on Corp. (3rd ed.) vol. 7, par. 5940, and cases cited. The only cases cited by defendants in support of the claim that the tax exemption feature of plaintiff's charter is a gratuity, are *West Wisconsin Railroad Co.* v. *Trempleau County Board of Supervisors,* 93 U. S. 595, 23 L. ed.

814, and *Tucker* v. *Ferguson,* 22 Wall. 527, 575, 22 L. ed. 805. In those cases the exemption provisions were not, as here, part of the charter contract but were subsequent legislative enactments, and it was held, and in the circumstances rightfully so, that they were without consideration and consequently subject to future legislative action. Moreover, the Constitutions of the states in which those cases arose reserved to the Legislature the power to alter, amend, and repeal, charters of corporations. Neither those cases, nor any that have come to our attention, lead us to doubt the sufficiency of the consideration to support the tax exemption provision in plaintiff's charter. Since this is so, the case falls within the well-established rule that where not forbidden by the Constitution or law of the State, any stipulation in the charter of a corporation, not subject to alteration or repeal, respecting the rate of taxation, providing for a commutation, or for an entire exemption of the corporate property, which has been accepted and acted upon by the corporation, will be considered as an inviolable contract under the federal Constitution. Cooley's Const. Limitations (8th ed.), vol. I, pp. 248, 265; *State of Alabama* v. *Alabama Bible Society,* 134 Ala. 632, 32 So. 1011; *St. Anna's Asylum* v. *New Orleans,* 105 U. S. 362, 26 Law ed. 1128; Thomp. on Corp. (3rd ed.), vol. 7, par. 5939, and many cases cited. It cannot be revoked or altered by a subsequent statute or even by an amendment to the State Constitution without the assent of the corporation. Thomp. on Corp., *supra,* and cases cited. Although this law has been vigorously assailed (see dissenting opinions in *Piqua Branch of State Bank of Ohio* v. *Knoop, supra,* and *Washington University* v. *Rouse,* 8 Wall. 441, 19 L. ed. 498), it has withstood the storms for more than a century. In *Piqua Branch of State Bank of Ohio* v. *Knoop, supra,* at page 382 of 16 How., 14 L. ed. 977, Mr. Justice McLean recognized the moral obligation imposed by such contracts in the following language: "Until a State is lost to all sense of justice and propriety, she will scrupulously abide by her contracts more scrupulously than she will exact their fulfilment by the opposite contracting party." Such was the legal and the moral view regarding contracts like the one before us prior to the so-called "New Deal," and we are aware of nothing therein to justify a change in either view.

242

■ ■ At the time plaintiff's charter was granted neither our Constitution nor statute forbade such tax exemption stipulations as is contained therein, and the right to alter or amend the charter reserved in section 10 thereof (above quoted) can by no stretch of interpretation be held to justify subsequent legislative interference with such exemption provision. Since this is so, the act of 1858 was unconstitutional, and unless and until accepted by plaintiff gave no authority to tax any of its property.

■ What has been said respecting plaintiff's acceptance of the act of 1858, and the effect of such acceptance, need not be repeated. Suffice it to say that the authorities cited in that connection abundantly sustain the proposition that one who accepts an unconstitutional legislative enactment and treats it as in force for years cannot be heard to question its validity. Nor can he challenge such enactment on the ground that it is discriminatory.

■ If plaintiff did not accept the act of 1858, all of its property is exempt from taxation on both grounds claimed by it; if it did, some of its property is not exempt on either ground. It is alleged in the answers that plaintiff paid taxes continuously after 1858, and some of us think this claim was made in oral argument without contradiction; but there is no finding to that effect, nor is the subject mentioned in the brief of either party. As the record stands none of plaintiff's property is taxable, but since the taxability of some of it depends upon plaintiff's attitude respecting the act of 1858, a decree should not be entered until that issue has been determined, and the case will be remanded for that purpose. This is in accordance with our practice where it appears that otherwise an injustice may be done. *Hebard* v. *Cutler,* 91 Vt. 218, 99 Atl. 879; *Hinsman* v. *Marble Sav. Bank,* 102 Vt. 217, 147 Atl. 270; *Neill* v. *Ward,* 103 Vt. 117, 156, 153 Atl. 219.

■ In no event can the decree as drawn be sustained. It includes the 1932 taxes which so far as the record shows were not involved, and it includes property not covered by the act of 1858. That act provides that whenever the value of the *real estate* "shall be increased from its present value by gift, grant, devise or purchase such increase shall not be exempt from taxation." Clearly this does not authorize taxing any of plaintiff's

personal property, and we think it equally clear that it was not intended to cover subsequently erected buildings, additions, and improvements on the real estate it then owned. The obvious purpose was to prevent plaintiff from further reducing the grand list of Brattleboro by acquiring more of its taxable real estate, and not to prevent it from improving the real estate it then owned without subjecting such improvements to taxation. The language of the act indicates this: "Increased * * * by gift, grant, devise or purchase." Moreover, the State made subsequent appropriations for the improvement of plaintiff's buildings aggregating $14,000. See No. 132, Acts 1900; No. 149, Acts 1902; and No. 320, Acts 1908. It did not do this expecting such increased value would be taxed. If the act of 1858 is effective, because accepted by plaintiff, the only property taxable under it is such real estate as plaintiff acquired subsequent to its passage. This appears to have been the basis adopted for the 1930 list.

In our view of the case it is not necessary to consider the exceptions to the exclusion of evidence; and all other questions saved have been disposed of.

*Decree reversed, and cause remanded with directions that such further proceedings be had as may be required to determine whether plaintiff accepted the act of 1858 by paying taxes as therein required, and that thereupon a decree be entered in accordance with the views herein expressed.*

### Opinion on Motion to Amend Mandate and for Reargument.*

After the foregoing opinion had been handed down, counsel for defendants had leave to file a motion to amend the mandate and to reargue that phase of the case regarding the taxability of Lawton Hall, Tyler Hall, and Ripley Nurses' Home, pending which the judgment order has been withheld.

What defendants in fact want is to have the mandate so changed as to enable them to retry the question of the taxability of the buildings above mentioned. We say retry, because

---

* Opinion on motion filed June 23, 1934.

the record shows that that issue was presented at the hearing before the chancellor, that evidence was introduced thereon, and for aught that appears defendants then had an opportunity to go into the matter as fully as they desired to. The chancellor found when the buildings were erected and for what they have been used, and these findings were apparently satisfactory to defendants, since they were not excepted to nor were others asked for. Furthermore, the taxability of these buildings, under the findings before us, was discussed at length by both parties, in their briefs and orally, and no shortage in the findings was then suggested by anyone. Indeed, prior to the filing of this motion, no suggestion was made at any stage of the proceedings but that this matter was fully heard and adequately covered by the findings. In the circumstances, if the findings respecting this are "meagre," as defendants say, it is manifestly due to their own fault. Moreover, they do not now point out wherein they will be able to make a stronger case on a rehearing beyond showing that plaintiff kept a separate account of the income from each building and how much such income was. But evidence of this was before the chancellor as appears from the motion, and if they then deemed it essential they should have asked for a finding covering it.

The defendants say that we erred in holding that buildings erected after the passage of the act of 1858, on land previously acquired by plaintiff, are not taxable. But our conclusion was reached after a careful examination of the question, and we find no reason to change it. Moreover, it is in line with the construction heretofore given that act by the defendants, since it appears that although some of these buildings were erected nearly twenty years ago this is the first attempt to tax them.

*Motion denied. Let full entry order go down at once.*