### Medical Center Hospital of Vermont, Inc. v. City of Burlington

[566 A.2d 1352]

No. 87-501

Present: Peck, Gibson, Dooley and Morse, JJ., and Barney, C.J. (Ret.), Specially Assigned

Opinion Filed October 13, 1989

*Spencer R. Knapp* of *Dinse, Erdmann & Clapp*, Burlington, for Plaintiff-Appellee.

*Joseph E. McNeil*, City Attorney, and *Francis X. Murray*, Special Counsel, of *McNeil, Murray & Sorrell, Inc.*, and *John L. Franco*, Assistant City Attorney, Burlington, for Defendant-Appellant.

*Martin K. Miller* and *Anne Cramer Hong* of *Miller, Eggleston & Rosenberg*, Burlington, for amicus curiae Vermont Hospital Association.

*Michael F. Anthony, Jeffrey M. Teske* and *Paul A. Hattis*; and *Lawrence Gerber, Fred I. Feinstein* and *Stewart T. Karge* of *McDermott, Will & Emery* (Of Counsel), Chicago, Illinois, for amicus curiae American Hospital Association.

**Gibson, J.** Defendant City of Burlington (City) appeals from a judgment declaring plaintiff to be exempt from taxation under 32 V.S.A. § 3802(4). We affirm.

Plaintiff Medical Center Hospital of Vermont (MCHV) is a nonprofit corporation organized under the laws of the State of Vermont with a general purpose, as stated in its amended articles of association, "of establishing and maintaining a public hospital and nursing home exclusively for charitable and educational purposes." As a nonprofit corporation, MCHV has no capital stock and no shareholders. It is governed by a board of nineteen trustees who serve in that position without pay. MCHV's mission, as stated by the board of trustees, "is to provide high quality primary, secondary, and tertiary health care at the lowest cost" possible.

On June 23, 1987, defendant sent MCHV a notice of assessment and a tax bill of approximately $2.8 million. Neither plaintiff nor its immediate predecessors[1] have ever been taxed by defendant, despite prior efforts to do so. See *Medical Center Hospital of Vermont, Inc. v. City of Burlington*, 131 Vt. 196, 303 A.2d 468 (1973). Less than a week after receiving the tax bill, MCHV commenced this action, requesting injunctive relief and a declaratory judgment that its property was exempt from taxation pursuant to 32 V.S.A. § 3802(4). Defendant counterclaimed for a declaratory judgment that MCHV was taxable, and in the alternative, that portions of the hospital were taxable as not primarily used for charitable purposes. Defendant also claimed that under 32 V.S.A. § 3832(7) a public vote was necessary to exempt plaintiff from property taxes, and that MCHV property leased out for profit was taxable absent a vote of exemption under § 3832(6). After a five-day trial, the trial court

---

[1] MCHV was formed in 1967 by the merger of the Mary Fletcher Hospital, founded in 1876, and the DeGoesbriand Memorial Hospital, founded in 1924.

determined that plaintiff was exempt from property taxation under § 3802(4), and that no public vote was required.

Defendant has appealed the trial court's decision, alleging four grounds for reversal: (1) that the court erred as a matter of law in declaring MCHV exempt from taxation under 32 V.S.A. § 3802(4); (2) that even if the hospital is a charity, MCHV property that is used for "health purposes" is taxable because no exemption has been voted it as provided by 32 V.S.A. § 3832(7); (3) that the trial court erred in exempting all MCHV property from taxation; and (4) that the City was denied a fair and impartial trial because of various evidentiary and discovery rulings made by the court. We address these issues seriatim.

## I.

It is axiomatic that a tax exemption is to be strictly construed against the party claiming it, although such a provision must be construed reasonably and not in a manner that would defeat the purposes of the statute. *American Museum of Fly Fishing, Inc. v. Town of Manchester*, 151 Vt. 103, 108, 557 A.2d 900, 903 (1989). In applying the general exemption contained in 32 V.S.A. § 3802(4),[2] this Court has consistently held that the crucial factor is the primary use to which the property is put. *Id.* at 108–09, 557 A.2d at 903.

In the case of *Brattleboro Retreat v. Town of Brattleboro*, 106 Vt. 228, 236, 173 A. 209, 212 (1934), we noted that

> [w]hat constitutes a public charity has been stated recently by this Court. The distinctive features of a charitable organization, the property of which is exempt from taxation, are that it has no capital stock and no provision for making dividends and profits, but derives its funds mainly from public and private charity, and holds them in trust for the objects and purposes expressed in its charter, *the test being whether it exists to carry out a purpose recognized in law as charitable or whether it is maintained for gain, profit, or private advantage.*

---

[2] 32 V.S.A. § 3802(4) provides that "[r]eal and personal estate granted, sequestered or used for public, pious or charitable uses" is exempt from taxation.

(Emphasis added; citations omitted.) In the intervening fifty years since *Brattleboro Retreat* was decided, this Court has not had occasion to further refine the test of charitable use.

Defendant today urges us not only to rely on *Brattleboro Retreat* in ascertaining the plaintiff's taxable status, but to do so in a restrictive way. At trial defendant did not dispute that the purpose of the Medical Center was charitable, but argued that the actual operation was not consistent with the charitable purpose. Primary among defendant's arguments is that MCHV failed to prove that it dispenses an amount of free care in excess of the revenues it receives from paying patients, and that it failed to prove that its funds are derived "mainly from public and private charity." *Id.* at 236, 173 A. at 212.

To prove its arguments, defendant contends that the only competent evidence as to free care rendered by plaintiff came in the form of policy statements from plaintiff's president and from written brochures stating that care at the Medical Center was available to the public without restriction on any basis. But we find nothing in *Brattleboro Retreat* or, indeed, in any subsequent Vermont cases that requires an institution to dispense *any* free care in order to be considered charitable for purposes of 32 V.S.A. § 3802(4). In fact, in *Brattleboro Retreat* this Court held that "[t]he fact that *none* of its patients are cared for without charge does not deprive it of its charitable feature." 106 Vt. at 237, 173 A. at 212 (emphasis added). It seems clear that this state has never required a certain percentage of free care to be rendered before finding an organization to be a tax-exempt charity, unlike other jurisdictions which have imposed such restrictions. See, e.g., *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 22, 487 A.2d 1306, 1317 (1985) (one of five characteristics of a public charity is that it "[d]onates or renders gratuitously a substantial portion of its services"); *Aransas Hospital, Inc. v. Aransas Pass Independent School District*, 521 S.W.2d 685, 691 (Tex. Civ. App. 1975) (not charity when only 1.9% of admissions in five years were charitable cases). In our opinion, pegging charitability to a stated amount of free care rendered would not be workable in determining an organization's taxable status. Instead, uncertainty would reign, with

taxability determined on a yearly basis depending on economic factors not within the control of any one person or organization.[3] See, e.g., *Southern Methodist Hospital & Sanatorium v. Wilson*, 51 Ariz. 424, 431, 77 P.2d 458, 462 (1938) ("the position that the test of a charitable institution is the extent of the free services rendered[] is difficult of application and unsound in theory"; institution is charitable if purpose is recognized as charitable and if not operated for profit, even if it charges for most or all of its services, so long as revenues are devoted to carrying out the charitable purpose).

■ The better inquiry, it seems to us, is the one used by the trial court in this case: whether health care was made available by the plaintiff to all who needed it, regardless of their ability to pay. This policy was adequately proved by plaintiff through the testimony of its president and through its written documents detailing the availability of free care to those in need.

This "open-door" policy finding by the trial court reflects settled Vermont law regarding the characteristics of charitable trusts, an area of law closely connected to the inquiry at hand. In *Jones v. Vermont Asbestos Corp.*, 108 Vt. 79, 91, 182 A. 291, 296 (1936), a charitable trust was found where (1) the purpose of the grant was educational and religious; (2) there was no private gain, profit or advantage; and (3) the trust's benefits were "conferred upon an uncertain and indefinite number of persons." Indeed, exemptions under the "public use" language of 32 V.S.A. § 3802(4) have similarly been required to be beneficial to "an indefinite class of persons who are part of the public" so that society as a whole is benefited. *American Museum of Fly Fishing*, 151 Vt. at 110, 557 A.2d at 904. To the extent, then, that plaintiff has maintained an open-door policy, that factor also leads to a conclusion that its primary use is for charitable purposes. Compare *Haines v. St. Petersburg Methodist Home*,

---

[3] As plaintiff pointed out at trial, if the economy in the Burlington area were to fall off dramatically and unemployment to soar, fewer people would be covered by health care insurance through employers and, consequently, more free care would be rendered to those in need. Should the economy make a turnaround the following year, the amount of free care given might fall again should unemployment levels drop.

Inc., 173 So. 2d 176, 183 (Fla. Dist. Ct. App. 1965) (nursing home which was not available to general public and required payment from applicants before acceptance into facility was not charitable); *People ex rel. Cannon v. Southern Illinois Hospital Corp.*, 404 Ill. 66, 69, 88 N.E.2d 20, 21 (1949) ("[a] hospital . . . open to all persons, regardless of race, creed or financial ability, has, on several occasions, been held by this court to be a charitable organization"); *West Allegheny Hospital v. Board of Property Assessment*, 500 Pa. 236, 239, 455 A.2d 1170, 1171 (1982) (hospital found to be exempt "maintained an 'open-admission policy,' pursuant to which [it] has provided comprehensive health care without regard to a patient's ability to pay") with *Georgia Osteopathic Hospital, Inc. v. Alford*, 217 Ga. 663, 664, 124 S.E.2d 402, 403 (1962) (hospital not exempt where treatment was "limited to patients of doctors on the staff . . . and the general public is not admitted without" a staff doctor's order).

Defendant also claims that *Brattleboro Retreat* requires a showing by plaintiff that the majority of its income is derived from charitable sources. While it is clear that that was a factor set forth in the *Brattleboro Retreat* case, 106 Vt. at 236, 173 A. at 212, we do not believe that we are therefore required to ignore the immense sociological and economic changes that have taken place in the health care profession since that time.[4] In essence, defendant argues that since the advent of third-party health care payment programs (whether it be Medicare, Medicaid, or private insurance), a hospital can no longer be charitable.

■■ We conclude that the trial court properly rejected this position. We note, first of all, that it is not within this Court's power to grant tax exemptions, that power reposing solely in our Legislature. See *Colton v. City of Montpelier*, 71 Vt. 413, 415, 45 A. 1039, 1040 (1899) ("The general right to make exemptions is involved in the right to apportion taxes, and must be

---

[4] We also note that even in *Brattleboro Retreat* it is not clear that the majority of its funds were derived from charity. See 106 Vt. at 235, 173 A. at 211–12 (listing income from state appropriations and donations, but not specifying what amount of income came from the "support of its patients," its third source of revenue).

understood to exist in the supreme legislative power . . . ."). We cannot assume that the Legislature has failed to take notice of the changing nature of health care compensation; yet, it has rejected any attempts to change the taxable status of hospitals.[5] Secondly, it is unreasonable to suggest that because modern medical institutions no longer operate in precisely the same manner as they did many years ago, they should lose their traditional tax-exempt status. We recognize, as have other jurisdictions, that the definition of "charitable organization" need not be locked into the past. See, e.g., *SHARE v. Commissioner of Revenue*, 363 N.W.2d 47, 52 (Minn. 1985) ("We recognize that major changes in the area of health care, especially in modes of operation and financing, have necessitated changes as well in definitional predicates. The term 'charitable' as applied to health care facilities has been broadened since earlier times, when it was limited mainly to almshouses for the poor."); *Evangelical Lutheran Good Samaritan Society v. County of Gage*, 181 Neb. 831, 836, 151 N.W.2d 446, 449 (1967) ("With the advent of present day social security and welfare programs, this type of charity is not often found because assistance is available to the poor under these programs. Yet, ' . . . the courts have defined "charity" to be something more than mere alms-giving or the relief of poverty and distress, and have given it a significance broad enough to include practical enterprises for the good of humanity operated at a moderate cost to those who receive the benefits.' " (quoting *Young Men's Christian Ass'n v. Lancaster County*, 106 Neb. 105, 111, 182 N.W. 593, 595 (1921))).

---

[5] In fact, in December of 1985 the Mayor of Burlington created a task force to consider revenue-raising alternatives available to the defendant City, which was faced with what the task force described as a "financial crisis." Its report, issued on January 10, 1986, concluded that the tax exemption granted to MCHV was "inherently unfair," since these institutions "do not compensate the City of Burlington for services rendered." The task force accordingly recommended that the City change its charter to allow taxation of plaintiff. Three weeks later, on January 29, 1986, House Bill 687 was introduced into the Legislature to accomplish that goal. The provisions allowing taxation of MCHV, however, did not survive, and the bill as finally passed did nothing to change the taxable status of plaintiff.

Here, plaintiff proved that its policy was to accept all patients regardless of ability to pay. Where insurance programs cover a patient, fees are collected, even though—as in the case of Medicaid—payments may be less than the hospital's cost of service. Evidence also tended to show that were it not for such revenue, several services rendered in Vermont solely by plaintiff (such as specialized cardiac care units, radiation therapy, renal dialysis, kidney transplants and an intensive-care nursery) might not be made available, as those services are operated at a loss to the hospital and are cross-subsidized by revenue-generating operations.

■ Defendant argues that plaintiff cannot be described as "not-for-profit" merely because it does not operate at a loss. We disagree. Our case law supports the proposition that not-for-profit institutions may generate revenues in excess of their expenses in order to maintain the organization, the criteria being only that such revenues not be passed through to shareholders as profits but put back into operating expenses. See, e.g., *Brattleboro Retreat*, 106 Vt. at 235, 173 A. at 212 (Retreat's average net income for the three years preceding action declaring it tax-exempt exceeded $125,000).

Defendant also contends that MCHV, although styled as a not-for-profit organization, in fact is operated for personal gain or advantage. See *Brattleboro Retreat*, 106 Vt. at 236, 173 A. at 212. To prove this contention, defendant introduced statistical evidence showing that there were larger-than-normal increases in certain executives' salaries in years when there were large increases in revenues, claiming that this proved the compensation to be "profit-driven." In short, defendant argued that these large salary increases actually represented a pass-on of dividends through the corporation to these executives. At the same time, however, defendant stipulated that the salaries being paid plaintiff's executives were comparable to the salaries paid such executives at other not-for-profit health care institutions of the size and nature of MCHV. As did the trial court, we find the stipulation to be dispositive. Although defendant's point—that executives at large medical centers receive much higher compensation generally than similar employees in other

professions—may be noteworthy, this lawsuit was not the proper forum in which to examine the pay disparity between professions, or even between for-profit and not-for-profit institutions.

■ We have found no case, and defendant has directed us to none, requiring employees of not-for-profit institutions to work for less than market rate in order for that institution to be deemed "charitable" for tax purposes. The one case cited by defendant, *Helton v. Sisters of Mercy of St. Joseph's Hospital*, 234 Ark. 76, 351 S.W.2d 129 (1961), is easily distinguished: the employees of the hospital were members of a Catholic religious order who worked for little or no pay. We see nothing in *Helton* which would change our opinion here.

■ We conclude that the evidence adduced by plaintiff amply supports the trial court's conclusion that plaintiff's operations constitute a charitable use within the meaning of 32 V.S.A. § 3802(4). Plaintiff's purpose, as spelled out in its articles of association, is to promote the health care needs of neighboring communities and the education of those in the health care professions. See *West Allegheny Hospital*, 500 Pa. at 239, 455 A.2d at 1171 (the promotion of health is a recognized charitable purpose). No evidence was brought forth to contradict plaintiff's pursuit of that charitable purpose. Because plaintiff is a not-for-profit institution with a recognized charitable purpose whose services are available regardless of ability to pay and whose excess revenues are devoted to the maintenance of its purpose, it is entitled to exemption from taxes under 32 V.S.A. § 3802(4).

## II.

Defendant next contends that even if plaintiff proved itself to be eligible for tax-exempt status under 32 V.S.A. § 3802(4), it still had the burden of proving that it was not excepted from the exemption by the provisions of 32 V.S.A. § 3832(7), which states as follows:

> The exemption from taxation of real and personal estate granted, sequestered or used for public, pious or charitable uses shall not be construed as exempting:

. . . .

(7) Real and personal property of an organization when the property is used primarily for health or recreational purposes, unless the town or municipality in which the property is located so votes at any regular or special meeting duly warned therefor.

Claiming plaintiff to be used primarily for health purposes, defendant argues that no tax exemption is warranted absent a vote of the citizens of Burlington.

■ Section 3832(7) appears on the surface to support defendant's contention. But while the plain and ordinary language of a statute is presumed to be intended, *In re Middlebury College Sales & Use Tax*, 137 Vt. 28, 31, 400 A.2d 965, 967 (1979), courts are not necessarily confined to a literal interpretation of the statutory language. Like all statutory language, subsection (7)'s meaning must be garnered from a reading of the statute as a whole, so as not to reach an absurd or irrational result. *In re Judy Ann's Inc.*, 143 Vt. 228, 231–32, 464 A.2d 752, 754–55 (1983).

Whereas § 3802(4) grants tax-exempt status to certain property used for religious, public or charitable purposes, § 3832 enumerates specific exceptions to that provision. Two of the seven subsections deal specifically with hospital property. First, subsection (2) excepts certain property owned by a religious society, while clearly preserving the exemption for the society's church edifice and parsonage, and its buildings used as a school *or hospital.* Subsection (6) in turn removes the tax-exempt status of real or personal property owned by orphanages, homes or hospitals that are "not used for the purpose of such institution but leased to others for income or profit" unless the town votes to so exempt it.

To read subsection (7) as removing plaintiff's tax-exempt status absent voters' approval is to ignore the plain meaning of subsections (2) and (6), which clearly intend to retain the tax-exempt status of hospital property so long as it is not leased out for profit. Therefore, to read subsection (7) as encompassing hospital property would lead to the irrational result of rendering portions of subsections (2) and (6) meaningless.

The cases interpreting subsection (7) have never dealt with a claim that hospital property is subject to its provisions. See, e.g., *Middlebury College v. Town of Hancock*, 147 Vt. 259, 261, 514 A.2d 1061, 1063 (1986) (holding that the Middlebury College Snow Bowl, used primarily for recreational purposes, is subject to taxation under 32 V.S.A. § 3832(7)); *Planned Parenthood of Vermont, Inc. v. City of Burlington*, 146 Vt. 348, 352, 503 A.2d 545, 547–48 (1985) (rejecting contention that "health" as used in the statute incorporates all activities related to health maintenance); *Fletcher Farm, Inc. v. Town of Cavendish*, 137 Vt. 582, 585, 409 A.2d 569, 571 (1979) (therapeutic community residence was property used for either health or recreational purpose and thus was subject to taxation under 32 V.S.A. § 3832(7)). The case relied on by defendant, *In re Northeast Washington County Community Health Center*, 148 Vt. 113, 530 A.2d 558 (1987), is not persuasive, in that the issue in that case was not whether the health center was within the meaning of § 3832(7), but whether the town voters had authority to revoke a previously approved exemption under subsection (7).

■ We conclude, as did the trial court, that the phrase "for health purposes," as used in 32 V.S.A. § 3832(7), cannot be read to include hospital property. Anticipating this interpretation, defendant further argued that if hospital property is not included within subsection (7)'s purview, then MCHV property used for outpatient care *should* be included, since "hospital" is defined at 18 V.S.A. § 1902(a) as "a place devoted primarily to the maintenance and operation of diagnostic and therapeutic facilities for *in-patient* medical or surgical care." (Emphasis added.)

■ We are not persuaded by this argument. First, we note that defendant failed to raise this issue until its post-trial motion under V.R.C.P. 52(b) to reopen discovery, which was denied. Furthermore, neither § 3802(4) nor § 3832(7) distinguishes between a hospital's inpatient and outpatient facilities for taxation purposes; by its own terms, the definitions set forth in § 1902 apply only to "words and phrases, as used in this chapter," and absent a further expression of legislative intent, we see no compelling reason to incorporate the definition used in Title 18,

which regulates the licensing of hospitals, into the earlier enacted tax statutes of Title 32.

## III.

Defendant raises as its third claim of error the trial court's exemption of all plaintiff's property from taxation. Specifically, it claims that the parking garage, the Burgess Building, the Adams Building, offices used by anesthesiologists and radiologists, and the data processing and laboratory facilities all represent incidental uses of hospital property and, as such, should be taxable under *Gifford Memorial Hospital v. Town of Randolph*, 119 Vt. 66, 72, 118 A.2d 480, 484 (1955), which holds that only "[r]eal estate used for purposes directly connected with the running of" a charitable institution is exempt from taxation.

It is defendant's position that the enumerated facilities associated with the medical center are not used for purposes sufficiently "directly connected" to its operation. We disagree, and conclude that the findings support such a connection as to each of the facilities challenged by defendant. The Burgess Building houses the administrative offices of the Vermont Health Foundation, a not-for-profit corporation which functions as plaintiff's parent company. The Foundation, like plaintiff, is organized "to promote the charitable, educational and scientific purposes" of the medical center. The Adams Building houses sleeping quarters for plaintiff's house staff, residents and physicians employed by the hospital to provide around-the-clock patient care. We conclude that both buildings are "directly connected" to plaintiff's operation and are used "in a way that is essential to the operation of the [hospital] and in furtherance of its charitable purpose." *Shelburne Museum, Inc. v. Town of Shelburne*, 129 Vt. 341, 344, 278 A.2d 719, 721 (1971).

So, too, is the parking garage directly connected to plaintiff's operation. The court found, and defendant does not challenge, that the facility is used primarily by families and visitors of patients and by patients obtaining services at the medical center. We note other jurisdictions have similarly found hospital parking lots to be tax exempt. Compare *Northwestern Memorial Foundation v. Johnson*, 141 Ill. App. 3d 309, 314, 490

N.E.2d 161, 164 (1986) (parking lot for which hospital charged monthly fee found to be tax-exempt); *Hotel Dieu v. Williams*, 410 So. 2d 1111, 1112 (La. 1982) (office building and parking garage, used for purposes related to adjoining hospital's exempt purpose, likewise found to be exempt); *Methodist Hospitals of Memphis v. Assessment Appeals Commission*, 669 S.W.2d 305, 307 (Tenn. 1984) (nonprofit hospital's employee parking lot was exempt as an essential and integral part of hospital) with *In re Queen's Medical Center*, 6 Haw. App. 152, 157–60, 715 P.2d 349, 353–54 (1985) (office building and parking garage not exempt because not all those using garage used hospital, and not all doctor's patients were also hospital's patients).

Plaintiff also provides office space, free of charge, to anesthesiologists and radiologists on its staff. Defendant claims that the use of these offices is not connected to the hospital's primary purpose, a statement with which we must disagree. These physicians' duties require their presence at the hospital in order to fulfill their staff functions. Thus, these offices seem directly and reasonably connected to the hospital's operation, since, as the trial court found, the offices are there for the convenience of the hospital and for the benefit of its patients.

Defendant also challenges the tax-exempt status of the data processing area and laboratories of plaintiff on the grounds that these activities admittedly generated a small amount of business income not related to the hospital's main use, on which plaintiff pays federal income taxes. We do not agree with defendant's position that because some taxable income is generated by these activities, they are not as a whole tax-exempt. It is clear that the profit-generating activities of these two facilities were incidental to their main uses by plaintiff, and it is the primary use of property that determines its taxable status. *Gifford Memorial Hospital*, 119 Vt. at 72, 118 A.2d at 484.

## IV.

Finally, defendant argues at length that various discovery and evidentiary rulings deprived it of a fair and impartial trial.

Defendant's first claim of error was that the trial court's findings with respect to the issue of free care contradicted its own evidentiary rulings. Primary among its arguments on this issue is that plaintiff was allowed to introduce evidence of its free care policy not for the truth of the matter asserted—that is, that free care was actually delivered—but only to prove the existence of the policy. Defendant claims on appeal that it did not introduce evidence that plaintiff did not in fact implement an open-door policy because evidence of actual free care was not before the court.[6] Thus, defendant now claims that the trial court's findings[7] that plaintiff maintained an open-door policy were incorrect.

▪ A review of the record indicates that there was ample evidence to support a finding that an open-door policy was in effect at the medical center. Plaintiff's president testified that the policy existed, the written brochures reiterated that policy, and the president further testified that it was MCHV's policy and practice to carry out this mission. The chair of the "charity committee," which is the MCHV instrument for deciding who is eligible to receive free care, also testified as to plaintiff's policy and practice. We therefore conclude that the trial court's findings as to plaintiff's open-door policy were supported by credible evidence and are not clearly erroneous. V.R.C.P. 52(a).

▪ Defendant next argues that the trial court wrongly excluded facts and opinion evidence regarding MCHV's executive compensation scheme, through which it attempted to prove that such compensation was actually a pass-on of corporate profits. To the extent that evidence was not allowed on this subject, we find there to be no error. Defendant's main contention is that it

---

[6] Defendant contends that had it known the court would rely on the written evidence of an open-door policy at MCHV, it would have proffered testimony that certain patients had been denied admission to the hospital because of their inability to pay. A review of the record, however, indicates no attempt by defendant to bring forth any such evidence nor any offers of proof. There can be no claim of error when defendant failed to adduce proof of its own accord even though it viewed the legal significance of plaintiff's testimony in a different light than the trial court.

[7] Finding 21 states: "Plaintiff does not deny essential care on any basis." Finding 25 states: "The plaintiff does not deny anyone needed care."

was somehow prejudiced by the court's decision not to allow testimony as to the exact amount of the salaries received by plaintiff's executives. The court nevertheless allowed extensive testimony as to a statistical analysis of the salary information, which its expert claimed proved a "profit-driven" form of compensation was used by the hospital. Given the parties' stipulation that the salaries at issue were comparable to those paid in similar not-for-profit hospitals, we see no prejudice to defendant resulting from the disallowance of specific salary information.

 Defendant also urges as error the trial court's denial of certain discovery requests to pursue an allegation that there was self-dealing between the hospital's trustees and other entities with which plaintiff had business dealings. We note, first, that discovery rulings are within the court's sound discretion, and will not be disturbed on appeal unless that discretion has been abused or withheld entirely. *Poplaski v. Lamphere*, 152 Vt. 251, 255, 565 A.2d 1326, 1329 (1989). Without going into all of defendant's arguments on this point, it suffices to point out that the issues raised by defendant on this matter go more to questions of whether the trustees' actions in awarding certain business contracts and in the conduct of the hospital's monetary affairs were carried out within the bounds of their fiduciary duties. We recognize that defendant was attempting to prove that plaintiff was not in fact a not-for-profit institution in that some of its trustees may have benefited from these business dealings. We conclude that even were defendant allowed to discover the information sought, and were then to prove such a breach of fiduciary duties, that would not have proved that plaintiff itself was a profit-making institution. The information sought by defendant thus was not material to the issues before the court.

*Affirmed.*