Dr. James FERRO, Petitioner,

v.

UTAH DEPARTMENT OF COMMERCE, DIVISION OF OCCUPATIONAL AND PROFESSIONAL LICENSING, Respondent.

No. 910313–CA.

Court of Appeals of Utah.

March 3, 1992.

508

Daniel G. Darger (argued), Salt Lake City, for petitioner.

R. Paul Van Dam, Atty. Gen., Robert E. Steed (argued), Asst. Atty. Gen., Salt Lake City, for respondent.

Before BENCH, P.J., and BILLINGS and RUSSON, JJ.

## OPINION

BENCH, Presiding Judge:

Petitioner Dr. James Ferro seeks licensure as a psychologist in the State of Utah. The Division of Occupational and Professional Licensing (Division) denied his application. Dr. Ferro has petitioned this court to review the Division's denial of his application. We reverse.

## BACKGROUND

Dr. Ferro received his doctoral degree in psychology from the Union for Experimenting Colleges and Universities (UECU) in 1980. At that time, UECU was not an ·accredited institution. In 1985, UECU became accredited with the regional accrediting body. In 1986, Dr. Ferro sought licensure as a psychologist in the State of Utah by filing an application with the Division. That application was denied because Dr. Ferro's doctoral degree was not from an accredited university as required by subsection 3(2)(c) of the Psychologists' Licensing Act (the Act). Utah Code Ann. § 58–25a–1 to –13 (1990).[1]

In 1990, Dr. Ferro submitted a second application to the Division. The application indicated that five months earlier, Dr. Ferro had received a license as a psychologist in California. He therefore requested that his application be considered under the recently added reciprocity provision for psychologists licensed to practice in other states. *See* Utah Code Ann. § 58–25a–5 (1990). Again, the Division denied his application, indicating in a letter that "California's licensure requirements are not equal to Utah's requirements and that your licensure status in California is not substantially in compliance with the provisions of the Psychology Licensing Act." As the Division admits, neither the Division nor the Psychologists' Licensing Board (Board) conducted a complete evaluation of Dr. Ferro's application because of the Division's determination that Dr. Ferro failed to meet the threshold requirement of having completed a doctoral program at an accredited school.

Dr. Ferro sought and obtained a review of the denial of his application by a special appeals board called by the Division. Following the hearing, the special appeals board entered its findings of fact and conclusions of law recommending rejection of Dr. Ferro's application because he did not meet the minimum mandatory education requirements found in Utah Code Ann. § 58–25a–3 ("section 3"). The Division followed the recommendation of the special

1. Utah Code Ann. § 58–25a–3(2) (1990) provides:

 Each applicant for admission to the licensure examination shall:
 (a) complete an application for admission as specified by the division in collaboration with the board;
 (b) produce satisfactory evidence that he is of good moral character;
 (c) produce certified transcripts of credit from an accredited institution of higher education recognized by the division verifying satisfactory completion of a doctoral degree in psychology. The applicant must have also successfully completed specific core course work as defined by the division by rule;
 (d) produce documented evidence that the applicant has completed two years of supervised, professional experience, of which one year shall be postdoctoral in accordance with rules established by the division in collaboration with the board; and
 (e) pay a fee to the department as determined by it in accordance with Subsection 63–38–3(2).

appeals board and rejected Dr. Ferro's second application.[2]

Dr. Ferro claims his doctoral degree satisfies the education requirements of section 3 because UECU was accredited at the time he applied for licensure. In the alternative, he asserts that he qualifies for a case-by-case review of his qualifications under the terms of Utah's reciprocity statute, and that any statutory bar against him applying for licensure is unconstitutional.[3]

Dr. Ferro also asserts that he is entitled to attorney fees under 42 U.S.C. § 1988. We decline to address this issue, however, because Dr. Ferro's brief lacks sufficient legal analysis to support the claim. *See* Utah R.App.P. 24(a)(9) (1991) ("The argument shall contain the contentions and reasons of the appellant with respect to the issues presented, with citations to the authorities [and] statutes ... relied on."); Utah R.App.P. 18 (1991) (appellate rules apply equally to administrative petitions). *See also State v. Price,* 827 P.2d 247, 248 (Utah App.1992) (appellant's brief must contain adequate legal analysis or we will assume the tribunal acted properly).[4]

## STANDARD OF REVIEW

The Division's actions are governed by the Utah Administrative Procedures Act (UAPA), Utah Code Ann. §§ 63–46b–1 to –22 (1989). Dr. Ferro claims he is entitled to relief under subsection 16(4)(d), which provides that we may grant relief if an agency's interpretation of the law is erroneous. We review statutory interpretations by agencies for correctness, giving no deference to the agency's interpretation, unless the statute grants to the agency the discretion to interpret the statute. *Morton Int'l, Inc. v. Auditing Div. State Tax Comm'n,* 814 P.2d 581, 588 (Utah 1991).

A grant of discretion to interpret a statute may be explicit or implicit. *Id.* at 588. There is no explicit grant of discretion provided in the Act whereby the Division is directed to interpret the language involved here. We therefore must determine whether there is an implicit grant of discretion. *Id.* at 589. To do so, we first determine whether the statute is ambiguous. If the statute is clear and unambiguous, there is no implicit grant of discretion possible because there is no interpretation required by the agency. The agency simply applies the statute according to its plain language.[5]

If a statute is ambiguous, however, we apply traditional rules of statutory construction under the assumption that the Legislature was operating under such rules. We also assume that the Legislature expected the agency to likewise apply the traditional rules of statutory interpretation. No deference is therefore given to the agency's interpretation if an otherwise ambiguous statute may be interpreted in accordance with traditional rules of interpretation. *See Morton* at 589.

If, however, a traditional analysis of the statute does not resolve the

---

**2.** The Division was bound by statute to follow the recommendation of the special appeals board. Utah Code Ann. § 58–1–17(4)(b) (1990).

**3.** Inasmuch as we may resolve this petition on statutory grounds, we do not reach the constitutional arguments. *See State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985) (it is a fundamental rule that appellate courts should avoid addressing constitutional issues unless required to do so).

**4.** Dr. Ferro's claim contains many first impression issues that are not even recognized in his brief. In particular, Dr. Ferro's brief fails to show how this administrative petition is an "action or proceeding to enforce a provision of ... the Civil Rights Act of 1964." 42 U.S.C. § 1988. The brief also does not address the United States Supreme Court's holding in *Will v. Michi-*

*gan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), that a state is not a "person" for purposes of section 1983 damages. Dr. Ferro's brief also ignores section 17 of the Utah Administrative Procedures Act, which provides that this court may award damages "only to the extent expressly authorized by statute" when considering a petition to review agency action. Utah Code Ann. § 63–46b–17(1)(a) (1989).

**5.** If "statutory language is plain and unambiguous," we "will not look beyond to divine legislative intent. Instead, we are guided by the rule that a statute should be construed according to its plain language." *Allisen v. American Legion Post No. 134,* 763 P.2d 806, 809 (Utah 1988).

ambiguities and "there is no discernible legislative intent concerning a specific issue[,] the Legislature has, in effect, left the issue unresolved. In such a case, it is appropriate to conclude that the Legislature has delegated authority to the agency to decide the issue." *Id.* We assume that the Legislature expected the agency to use its expertise in choosing between the possible permissible interpretations. *Id.* The choice of interpretations in such cases is therefore viewed as a policy decision by the agency to which we give deference. *Id.*[6] As is apparent from our analysis, we find no explicit or implicit grant of discretion to the Division in this case and therefore apply a correction-of-error standard to the Division's interpretation of the Act.

### ANALYSIS

#### Accreditation

First we address Dr. Ferro's claim that his doctoral degree from a school that was not accredited at the time he graduated satisfies the statutory requirement of a doctoral degree from an accredited institution. According to Dr. Ferro, his degree satisfies this requirement because UECU was accredited at the time of his application. The Division, however, held as a matter of law that Dr. Ferro's doctoral degree did not satisfy the educational requirement because the school was not accredited at the time Dr. Ferro attended and graduated. Dr. Ferro asserts that the educational requirement is ambiguous on this point.

■ Section 3 provides that in order for an applicant to sit for the exam, the applicant must "produce certified transcripts of credit from an accredited institution of higher education recognized by the division verifying satisfactory completion of a doctoral degree in psychology." Section 58–25a–3(2)(c). Dr. Ferro asserts that the phrase "certified transcripts of credit from an accredited institution" indicates that the transcript must come from an institution that is accredited at the time the transcript is submitted; in other words, the phrase

"from an accredited institution" qualifies the term "transcript." The Division on the other hand, asserts that the credit must be from an institution accredited at the time the credit and doctoral degree are received; in other words, the phrase "from an accredited institution" qualifies the term "credit." When viewed in isolation, this provision is ambiguous because it "can be understood by reasonably well-informed persons to have different meanings." *Tanner v. Phoenix Ins. Co.*, 799 P.2d 231, 233 (Utah App.1990).

■ In determining whether the Legislature has implicitly granted the Division the discretion to interpret this education requirement, we first apply traditional statutory rules of construction. "[Q]ualifying words and phrases are generally regarded as applying to the immediately preceding words, rather than to more remote ones." *Salt Lake City v. Salt Lake County*, 568 P.2d 738, 740 (Utah 1977) (footnote omitted). Under this "last antecedent rule," the Division's interpretation is clearly correct.

■ The Division's interpretation is also supported by another cardinal rule of construction: "If there is doubt or uncertainty as to the meaning or application of the provisions of an act, it is appropriate to analyze the act in its entirety, in light of its objective, and to harmonize its provisions in accordance with the legislative intent and purpose." *Osuala v. Aetna Life & Cas.*, 608 P.2d 242, 243 (Utah 1980) (footnotes omitted). The purpose of the Act is to protect the public from unqualified persons by ensuring that applicants for licensure have certain minimum qualifications. *See* section 58–25a–1.

A requirement that an applicant present a degree from an institution that is accredited at the time of application, without any regard for whether the school was accredited at the time the degree was obtained, would be useless in ensuring a minimum standard of education. The accreditation status of a school at the time of application

---

**6.** *But see State v. Gallion,* 572 P.2d 683 (Utah 1977) (improper delegation of legislative powers); *Crowther v. Nationwide Mutual Ins. Co.,*

762 P.2d 1119, 1122 (Utah App.1988) (legislative policy decisions may not be delegated to agencies).

has no rational bearing on the quality of education actually received by the applicant. Accreditation at the time the student attended, on the other hand, is indicative of the quality of education received. A requirement of accreditation at the time of graduating therefore furthers the purpose of ensuring certain minimum educational standards. Under Dr. Ferro's interpretation, a graduate of a fully accredited and perhaps even highly prestigious school could be barred from applying for licensure in this state if, following the applicant's graduation, the school were to lose its accreditation. Such a result would clearly be illogical and inconsistent with the purpose of the Act.

 Inasmuch as the statute may be interpreted in accordance with traditional rules of statutory construction, we conclude that the Legislature has not left this issue unresolved. We therefore need not give any deference to the Division's interpretation. We nevertheless uphold the Division's interpretation as correct.[7] Dr. Ferro's doctoral degree, which is from an institution that was not accredited at the time the degree was obtained, does not satisfy the educational requirement found in subsection 3(2)(c) of the Act.

### Reciprocity

Dr. Ferro next argues that even if his doctoral degree does not satisfy the minimum educational requirements for licensure found in section 3, he is entitled as a licensed psychologist in the State of California to an individual review of his credentials under the reciprocity provision found in section 5 of the Act. The reciprocity provision provides that:

> The division with the approval of the board may issue a license under this chapter to an applicant who is currently licensed as a psychologist in any state, district, or territory of the United States or in any other jurisdiction approved by the board, and whose education, experience, examination, and character requirements are, or were at the time the license was issued, equal to the requirements of this chapter or *upon a finding by the board that the applicant, based upon education, experience, examination, and licensure status is substantially in compliance with the provisions of this chapter.*

Utah Code Ann. § 58–25a–5 (1990) (emphasis added).

 The special appeals board found that because the State of California does not require a degree from an accredited institution,[8] California's requirements were not in actual or substantial compliance with Utah's requirements.[9] The special appeals board also indicated that since

---

**7.** In an attempt to support its ruling on this matter, the Division relies upon its own administrative rule interpreting the Act. Rule R153–25a–4(2) (1991) of the Utah Administrative Code provides, with our emphasis, that "[a]n acceptable doctoral degree in psychology shall meet the following criteria: (a) the degree shall have been received from an institution of higher education in the United States or Canada which was accredited by a regional institutional accrediting body ... *at the time the applicant's degree was earned."*

The Division erroneously views its rule as determinative of the proper interpretation of the statute. Given the established rule that agency regulations may not "abridge, enlarge, extend or modify the statute creating the right or imposing the duty," *IML Freight, Inc. v. Ottosen,* 538 P.2d 296, 297 (Utah 1975), it is the statute, not the rule, that governs. If an agency regulation is not in harmony with the statute, it is invalid. Agency rules are therefore of little value in interpreting a statute unless the discretion to interpret the statute has been explicitly or implicitly granted to the agency by the Legislature. Since in this case we hold that no such discretion was granted to the Division, we do not rely upon its rule in our interpretation. We recognize, however, that Rule R153–25a–4 is in harmony with the Act in that the rule incorporates what we conclude is the correct interpretation of subsection 3(2)(c).

**8.** Section 2914 of the California Business and Professions Code provides that applicants for a psychology license shall have a doctoral degree "from an accredited or approved university, college, professional school, *or any other educational institution approved by the board as offering a comparable program* in regulations adopted under this chapter." (Emphasis added.)

**9.** The special appeals board erred in basing its decision on the fact that California's licensing requirements were not in substantial compli-

the Board does not have express statutory authority to conduct an independent review of a non-accredited school's doctoral program, as does California's board, that the requirement of a doctoral degree from an accredited school is mandatory for all applicants. The special appeals board therefore concluded that nothing short of actual compliance in the form of a doctoral degree from an accredited school would suffice, regardless of the reciprocity provision.

Dr. Ferro claims that the special appeals board misinterpreted the Act by ignoring the reciprocity provision with its express reference to substantial compliance. According to Dr. Ferro, the reciprocity provision grants him an *opportunity* to become licensed in Utah, even if he does not meet all of the minimum requirements found in section 3. Dr. Ferro asserts that the Board may grant him a license if it finds his credentials to be sufficient to meet the purpose of the Act, i.e., protecting the public from unqualified applicants. *See generally Moore v. Schwendiman*, 750 P.2d 204, 206 (Utah App.1988) (substantial compliance is appropriate when the purpose of the statute " 'can be accomplished in a manner other than that prescribed, with substantially the same results.' " (quoting *Wilcox v. Billings*, 200 Kan. 654, 659, 438 P.2d 108, 112 (1968)).

The Division contends that the substantial compliance language is of no effect because there is no other statutory language expressly permitting the board to admit an applicant with less than the mandatory minimum requirements found in section 3. What the Division fails to acknowledge, however, is that the reciprocity provision itself is the statutory authorization for adjusting the minimum requirements for reciprocity applicants.

The Division resorts to the well-established rule of statutory construction that specific provisions prevail over general provisions. *Williams v. Public Service Comm'n*, 754 P.2d 41, 48 (Utah 1988). The

Division misapplies the rule, however, by mischaracterizing what is specific and what is general. The Division views section 3 as the more specific provision. Section 3, however, applies generally to all applicants. The reciprocity provision applies only to a subgroup of all applicants, i.e., reciprocity applicants, and is therefore the more specific provision. *See Williams*, 754 P.2d at 48 (provisions of title 54 of the Code are more specific than UAPA since title 54 applies only to the Public Service Commission and regulated utilities, while UAPA applies to all agencies); *Southern Utah Wilderness Alliance v. Board of State Lands and Forestry*, No. 910129, — P.2d —, — (Utah Feb. 27, 1992) (provision of UAPA expressly excluding from its effect contracts for the sale of real property by all agencies is superseded by provision of title 65A expressly mandating that board's actions are governed by UAPA). *See also Osuala*, 608 P.2d at 242–43 (section limiting insurance coverage to three classes of persons prevailed over general purpose language). By its own terms, the reciprocity provision is therefore a specific exception from the general requirements of section 3.

The reciprocity provision is clearly intended to allow licensure of applicants with less than the minimum requirements set forth in section 3 because of their licensed status in other states. If the Legislature did not intend to limit or modify section 3, i.e., if it intended that reciprocity applicants strictly comply with that section, there would have been no need for a reciprocity provision. The reciprocity applicants would simply qualify directly under section 3.

■ To interpret the Act so as to ignore the reciprocity provision's express exception from the general requirements of section 3, would be to rewrite the Act and impermissibly render the reciprocity provision a complete nullity. *See Williams v. Mountain States Tel. & Tel.*, 763 P.2d 796,

ance with Utah's. The reciprocity provision makes it clear that it is the credentials of the reciprocity applicant, not the requirements of the licensing state, that are to be reviewed for

substantial compliance with the requirements found in the Act. This review has simply never occurred.

799 (Utah 1988) (agency may not rewrite legislation); *Downey State Bank v. Major–Blakeney Corp.*, 578 P.2d 1286, 1288 (Utah 1978) (statutes should be read so as to avoid making any of their provisions "surplusage and meaningless"); *Bagshaw v. Bagshaw*, 788 P.2d 1057, 1060 (Utah App. 1990) (applying general rather than specific provision would effectively repeal the specific provision). To adopt the Division's interpretation would also be contrary to our duty to "construe a statute on the assumption that each term is used advisedly and that the intent of the Legislature is revealed in the use of the term in the context and structure in which it is placed." *Ward v. Richfield City*, 716 P.2d 265, 266 (Utah 1984). *See also Madsen v. Borthick*, 769 P.2d 245, 252 n. 11 (Utah 1988) (appellate courts have fundamental duty to give effect, if possible, to every word of a statute).

> [A] statute should be applied according to its literal wording unless it is unreasonably confused or inoperable. We must assume that each term in the statute was used advisedly by the Legislature and that each should be interpreted and applied according to its usually accepted meaning.

*West Jordan v. Morrison*, 656 P.2d 445, 446 (Utah 1982) (citation omitted).

The reciprocity provision's exception to the general requirements of section 3 is not confused or inoperable. "We must be guided by the law as it is. We cannot by construction liberalize the statute and enlarge its provisions. When language is clear and unambiguous, it must be held to mean what it expresses, and no room is left for construction." *Hanchett v. Burbidge*, 59 Utah 127, 202 P. 377, 380 (1921). We therefore must give effect to the plain and unambiguous terms of the reciprocity provision by recognizing that it creates an exception to the general requirements found in section 3.[10]

The Legislature has chosen to make the section 3 requirements merely advisory as to reciprocity applicants. If the Division wishes to alter the Act to require that reciprocity applicants have a doctoral degree from an accredited school, its recourse is to the Legislature. The Division may not simply impose "additional requirements for psychologist licensure that are not contained within the plain meaning of the statutory language." *Fussell v. Department of Commerce*, 815 P.2d 250, 254 (Utah App. 1991).

## CONCLUSION

■ Since the reciprocity provision allows the Board to make a finding as to whether Dr. Ferro's credentials are in substantial compliance with the Act's requirements, we hold that it was error for the Division to disqualify him from the application process without the Board conducting an individualized review of his credentials.[11] We emphasize that our holding should not be misconstrued as requiring that Dr. Ferro be admitted to practice psychology in Utah. Under the reciprocity provision, that decision remains in the sound discretion of the Board.[12]

---

**10.** We note that because the reciprocity provision is unambiguous, there is no implicit grant of discretion to the Division to interpret its terms. We therefore apply a correction-of-error standard of review.

**11.** There may be some concern as to when the Board must review Dr. Ferro's credentials. The Board might make a finding before Dr. Ferro sits for the examination to see if his credentials substantially comply with the requirements found in subsection 3(2), and then make a second finding following the exam as to actual licensure under subsection 3(1). Alternatively, the Board might simply allow him to sit for the exam and then make only one finding regarding licensure following the exam. Either approach seems acceptable under the Act.

**12.** We note for purposes of determining the appropriate standard of review that a grant of discretion to an agency to make factual findings, such as the determination of whether Dr. Ferro's credentials are in substantial compliance with the requirements of the Act, should not be confused with a grant of discretion to interpret a given statutory term. Since the authority to make factual findings is often granted to agencies, such a misinterpretation would require deference to agencies in virtually every case—thereby causing the exception to consume the rule set forth in *Morton*.

515

The Division's rejection of Dr. Ferro's application is hereby reversed.

RUSSON, J., concurs.

BILLINGS, J., concurs in result only.