881 P.2d 880 (1994)
Kathleen C. HOWELL, Cache County Assessor, Petitioner,
v.
COUNTY BOARD OF CACHE COUNTY EX REL. IHC HOSPITALS, INC., Logan Regional Hospital, Respondents.
Robert L. YATES, Salt Lake County Assessor, Petitioner,
v.
COUNTY BOARD OF EQUALIZATION OF SALT LAKE COUNTY EX REL. IHC HOSPITALS, INC., Primary Children's Medical Center, Cottonwood Hospital, Wasatch Canyon Hospital, LDS Hospital, and Alta View Hospital, Respondents.
Ronald M. SMITH, Utah County Assessor, Petitioner,
v.
COUNTY BOARD OF EQUALIZATION OF UTAH COUNTY EX REL. IHC HOSPITALS, INC., Utah Valley Regional Medical Center, Orem Community Hospital, American Fork Hospital, and Springville Insta-Care Facility, Respondents.
Nos. 920604, 930010-930014 and 930023.
Supreme Court of Utah.
September 1, 1994.
*881 Bill Thomas Peters, Karl L. Hendrickson, Salt Lake City, for petitioners.
*882 Gary O. McKean, Logan, for Cache County.
Kay Bryson, Provo, for Utah County.
Alan L. Sullivan, Ronald G. Moffitt, Salt Lake City, for IHC Hospitals.
Jan Graham, Att'y Gen., Brian L. Tarbet, Kelly W. Wright, Asst. Att'ys Gen., Salt Lake City, for Utah State Tax Com'n.
Brian M. Barnard, John Pace, Salt Lake City, for amicus Citizens for True Tax Reform.
GREGORY K. ORME, Court of Appeals Judge:
The County Assessors of Cache, Utah, and Salt Lake Counties seek review of the Utah State Tax Commission's charitable property tax exemption standards for nonprofit hospitals and nursing homes. These consolidated appeals from decisions of the Tax Commission concern the tax exempt status of nine hospitals owned by IHC Hospitals, Inc. We hold the Tax Commission's standards to be constitutional and therefore affirm.

I. FACTS
Nearly nine years ago, this court issued its opinion in Utah County v. Intermountain Health Care, Inc., 709 P.2d 265 (Utah 1985). In Utah County, this court interpreted article XIII, section 2 of the Utah Constitution,[1] determined that the statutes purporting to implement this constitutional provision went too far,[2] and recognized appropriate tax exemption criteria for nonprofit hospitals. Id. at 267-70, 276-78.
In the spring of 1987, IHC applied to thirteen different county boards of equalization for property tax exemptions for its various hospitals.[3] All of the boards of equalization, *883 with the exception of Salt Lake County, granted exemptions to IHC's hospitals. In Salt Lake County, the board determined that LDS Hospital, Primary Children's Medical Center, and Wasatch Canyon Hospital were exempt but that Cottonwood Hospital and Alta View Hospital were not.
On August 25, 1988, while appeals from some of these decisions were pending before the Tax Commission, the Tax Commission suspended all county exemption proceedings to allow it the opportunity to promulgate uniform standards. In the Tax Commission's view, the general guidelines announced in Utah County and Yorgason v. County Board of Equalization, 714 P.2d 653 (Utah 1986),[4] could not readily be applied to individual cases so as to promote an acceptable degree of uniformity. The Tax Commission stated:
These [Supreme Court decisions] have presented a difficult problem for both county boards of equalization and the Tax Commission. Although they provide general guidance and signal the need for increased scrutiny, they do not provide counties or the Tax Commission with objective standards by which to measure the sufficiency of particular exemption applications. As a result, for 1986 and subsequent years, different counties proceeded to decide hospital and nursing home applications on the basis of widely divergent standards.
Recognizing that a uniform set of objective standards was needed, the Tax Commission decided to "provide county officials and property owners with a definitive set of guidelines in this area." Beginning in late 1988 and proceeding through 1989, the Tax Commission conferred with county assessors, other county representatives, nonprofit hospitals and nursing homes, and for-profit hospitals. A series of public hearings followed.
On December 18, 1990, after considering the lengthy debates and written submissions of interested parties, the Tax Commission announced its "Non-profit Hospital and Nursing Home Charitable Property Tax Exemption Standards." The Commission issued the standards "to suggest an objective and relatively simple framework for determining property tax exemption" and "to provide counties, property owners, and other interested parties with notice of the standards that the Tax Commission intends to observe in deciding appeals from county boards of equalization."
Thereafter, IHC applied to the appropriate county boards of equalization for exemption based on the Tax Commission's standards. With the exception of Utah County, every other county board of equalization granted each IHC hospital in its jurisdiction an exemption upon determining that the hospital complied with the Tax Commission's standards.
In Utah County, one member of the three-member board of equalization[5] recused himself because of a conflict of interest based on his personal involvement with IHC. Therefore, the exemption applications were considered by a two-person board. The two commissioners were divided on whether to grant the exemption. Lacking affirmative action granting the exemption, the IHC hospitals in Utah County were denied exemption for the tax years 1986 through 1991.
IHC appealed the denial of the Utah County exemption to the Tax Commission. Likewise, the Salt Lake and Cache County Assessors appealed the decisions to grant the exemption to the IHC hospitals within their counties. The appeals were consolidated and later considered by the Tax Commission pursuant to a motion for summary judgment filed by IHC. After briefing and argument, the Tax Commission granted summary judgment in favor of IHC. This decision, which effectively granted an exemption to all IHC hospitals in Utah for the tax years 1986 to 1991, was based on the determination that *884 the hospitals met the exemption standards issued by the Tax Commission and were therefore exempt from property taxation.
In the instant proceeding, the County Assessors seek our review. They challenge these grants of exemption for charitable use, arguing that the Tax Commission standards violate article XIII, section 2 of the Utah Constitution.
The facts are essentially undisputed. Both sides agree that patients have not been denied admission to IHC hospitals because of their inability to pay;[6] indigent patients received needed services for no charge or at a reduced rate;[7] the compensation IHC officers and employees receive is commensurate with similarly situated personnel in other hospitals; and unreimbursed medical costs associated with indigent care[8] have far exceeded the potential property tax of the hospitals over the tax years in question. Significantly, the assessors do not contend that any of the IHC hospitals are not in compliance with the standards set by the Tax Commission. Rather, they claim that the standards themselves are unconstitutional because, like the statutes condemned in Utah County, they go beyond the mandate of article XIII, section 2 of the Utah Constitution.[9]

II. ANALYSIS
As previously indicated, this court has interpreted article XIII, section 2, as it relates to tax exemptions for property used "exclusively" for charitable purposes, to require a six-factor analysis. See Utah County v. Intermountain Health Care, Inc., 709 P.2d 265, 269 (Utah 1985). The assessors do not ask us to reconsider the factors articulated by this court in Utah County. Additionally, they concede that the hospitals have complied with the applicable Tax Commission standards, regulations, and procedures. Given this posture and the lack of any substantial factual dispute, if we conclude that the Tax Commission's standards comply with the six-part analysis established in Utah County, then we must conclude that the standards are constitutional and that the exemptions at issue in this case were validly granted by the Tax Commission.

A. Standards Established in Utah County

A hospital qualifies for a charitable exemption under the Utah Constitution only if it "meets the definition of a `charity' or if its property is used exclusively for `charitable' purposes." Utah County, 709 P.2d at 269. The linchpin of "charity" in this context is the notion that a gift is being made to the community on an ongoing basis. See id. Whether a particular institution is in fact using its property exclusively for a charitable purpose depends on
(1) whether the stated purpose of the entity is to provide a significant service to others without immediate expectation of material reward; (2) whether the entity is supported, and to what extent, by donations and gifts; (3) whether the recipients of the "charity" are required to pay for the assistance received, in whole or in part; (4) whether the income received from all *885 sources (gifts, donations, and payment from recipients) produces a "profit" to the entity in the sense that the income exceeds operating and long-term maintenance expenses; (5) whether the beneficiaries of the "charity" are restricted or unrestricted and, if restricted, whether the restriction bears a reasonable relationship to the entity's charitable objectives; and (6) whether dividends or some other form of financial benefit, or assets upon dissolution, are available to private interests, and whether the entity is organized and operated so that any commercial activities are subordinate to or incidental to charitable ones.
Id. at 269-70.
These six factors, considered together, are designed to determine whether an institution has bestowed a "gift to the community." Id. at 269; see Yorgason v. County Bd. of Equalization, 714 P.2d 653, 657 (Utah 1986). The Tax Commission understandably concluded that these factors were too elusive for routine administrative application and thus set standards to ensure that the guidelines of Utah County would be evenly applied. We will evaluate the Tax Commission's standards with the same focus on defining "charity" as that used in Utah County, i.e., whether the Tax Commission's standards establish an appropriate method of evaluating whether a hospital has bestowed a "gift to the community" and therefore is eligible for a charitable property tax exemption.[10]
The assessors correctly point out that "Section 2 of Article XIII grants a charitable exemption and our statutes cannot expand or limit the scope of the exemption or defeat it." Loyal Order of Moose, No. 259 v. County Bd. of Equalization, 657 P.2d 257, 261 (Utah 1982). Obviously, this rule of law applies to administrative regulations as well as statutes.[11]See Ferro v. Utah Dep't of Commerce, 828 P.2d 507, 512 n. 7 (Utah Ct.App. 1992); Fussell v. Department of Commerce, 815 P.2d 250, 254 (Utah Ct.App.1991). Therefore, the Tax Commission's standards are subject to the same exacting constitutional scrutiny as were the statutes in Utah County. We now consider those standards under broad subject headings rather than sequentially.

B. Tax Commission Standards

1. Financial Considerations
Standard I requires that an institution be organized on a nonprofit basis and that its property be dedicated to its charitable purpose. The first part of this standard mirrors article XIII, section 2, which requires the owner of the exempt property to be a non-profit entity. Utah Const. art. XIII, § 2(c). In Utah County, we held that a hospital seeking an exemption must show that its "stated purpose" is "to provide a significant service to others without immediate expectation of material reward." 709 P.2d at 269. Specifically, Utah County required an examination into the institution's corporate purposes and whether the distribution of assets to private interests was restricted in its articles of incorporation. Id. at 272-73. Standard I requires a similar inquiry.
The assessors contend that this standard is deficient in that it fails to restrict the corporate purpose and activity to the charitable provision of health care and medical services. *886 They claim that the standard therefore fails to differentiate between charitable institutions providing benevolent care and predominately commercial organizations in the business of providing health care for compensation.
However, neither side suggests that if an institution met the requirements of standard I, this alone would be sufficient for it to qualify for an exemption. Thus, the assessors' point that standard I, by itself, does not sufficiently limit the organizations that qualify for an exemption is valid as far as it goes. But standard I was never intended to supersede all of the factors relevant to determining whether an institution qualifies for a charitable exemption. Standard I is merely an organizational standard, the satisfaction of which is a necessary, but not a sufficient, basis for entitlement to the exemption.[12]
Standard II requires the institution to demonstrate that net earnings and donations do not inure to the benefit of any private shareholder or individual. While in a sense redundant of standard I, this standard mirrors section 501(c)(3) of the Internal Revenue Code, which allows a charitable exemption if "no part of the net earnings ... inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(3) (1986). The assessors criticize this standard, claiming compliance with section 501(c)(3) is insufficient to ensure that self-inurement does not occur.[13]
The Tax Commission, however, acted efficiently and within its authority in patterning standard II, proscribing private inurement, after the language of section 501(c)(3). The United States Department of Treasury has authoritatively construed section 501(c)(3) in 26 C.F.R. § 1.501(c)(3) (1993) and in numerous revenue rulings regarding the exempt status of hospitals and other charitable organizations. See, e.g., Rev.Rul. 69-545, 1969-2 C.B. 117. Additionally, federal courts have construed these provisions, resulting in a well-developed body of law defining "private inurement" in the medical service arena. See Stand.Fed.Tax Rep. (CCH) ¶ 22,609.30 (1993) (citing numerous cases). Rather than creating a new set of rules to help determine the scope of the private inurement requirement, the Tax Commission incorporated a federal scheme that has been widely applied.[14] The Tax Commission's decision to pattern standard II after the language of section 501(c)(3) does not defeat the constitutionality of standards that otherwise satisfy the guidelines this court announced in Utah County.[15]

2. Access, Public Interest, and "the Community"
Standard III ensures open access to medical services regardless of race, religion, gender, *887 or ability to pay. In addition, under this standard, the hospital must provide evidence of its efforts to inform the public of its open-access policy and of the availability of services for the indigent.[16] This standard reflects several of the guidelines established in Utah County, specifically those concerning "whether the stated purpose of the entity is to provide a significant service to others without immediate expectation of material reward"; "whether the recipients of the `charity' are required to pay for the assistance received, in whole or in part"; and "whether the beneficiaries of the `charity' are restricted or unrestricted and, if restricted, whether the restriction bears a reasonable relationship to the entity's charitable objectives." 709 P.2d at 269.
Standard IV requires each applicant to demonstrate that its policies reflect the public interest. More specifically, this standard mandates that each institution maintain a "charity plan" and that each applicant's governing board consist of a broad-based membership, operate in an open atmosphere, and meet at least annually to address the needs of the community. The assessors contend that this "standard deviates from the requirements of [Utah County] in its broad and somewhat global interpretation of the term `community.'" The assessors' concern is that IHC could use revenue generated in part from exemptions granted by one county's board of equalization outside that county's borders to expand the IHC health care system in other counties or in other states. Thus, the assessors claim that standard IV is flawed because it does not prevent IHC from receiving subsidies and benefits from citizens of one county and diverting those savings to areas outside the local community.
In support of their argument, the assessors point to the following language from Utah County:
In view of the fact that Intermountain Health Care owns and operates facilities, for-profit and nonprofit, throughout this state and in other states, we are particularly concerned that there is no showing on the record that surplus funds generated by one hospital in the system will not be utilized for the benefit of facilities in other counties, outside the state of Utah, or purely for administrative costs of the system itself.
709 P.2d at 275. In Utah County, however, we did not attempt to define or limit the term "community"; rather, we simply criticized IHC for not having properly indicated "on the record" the manner in which its net earnings were allocated. Id. That shortcoming has not been repeated in this case.
Moreover, accepting the assessors' narrow definition of "community" would prevent IHC from allocating net earnings derived from one hospital for use in another and might therefore inhibit the charitable mission of IHC as a whole, particularly its outreach programs. See supra notes 6 & 7. Standard IV appropriately recognizes that some hospital organizations may have satellite facilities in rural areas of Utah that operate at a deficit. If these rural hospitals were prevented from receiving support derived from other hospitals, they might be closed, leaving those areas without adequate health care and requiring citizens, including those of limited means, to travel to urban areas for medical care, further burdening the hospitals there. A broader view of community, and a wider sharing of the expense of providing quality medical care, avoids such anomalies.

3. Satellite and Outreach Facilities
Somewhat related to standard IV is standard VI, which entitles IHC's satellite health care facilities and its centralized support facilities to a property tax exemption if it is shown that these facilities enhance the hospitals' charitable mission. In the context of this case, the standard primarily relates to IHC's indigent care clinics and "Instacare" facilities, each of which is operated as an outreach arm of an associated hospital, and IHC's central offices, which provide management, planning, accounting, and related services to the hospitals.
*888 The assessors object to this standard on the ground that satellite facilities should independently demonstrate that they, "in their own separate operation, qualify for property tax exemption." The assessors contend that the standard would allow "a purely commercial activity extending limited or no charity to qualify for exemption based on the performance of another facility."
The facts of this case, however, do not validate the assessors' expressed concern. The satellite facilities are not purely commercial activities with limited or no charitable purpose. Contrary to the assessors' contention, the satellite facilities advance the charitable purposes of the hospitals with which they are associated.[17] For example, the operation of a clinic in a rural or inner-city area extends the reach of quality medical care to places where it might otherwise be lacking and thus is inarguably a gift to the community. The clinics are governed by the same policies regarding indigent admissions and care as the hospitals with which they are associated. We therefore conclude that a satellite facility may properly come within the umbrella of a hospital's exemption if it advances the charitable purposes of the hospital and is governed by the same charity-care policies that govern the exempt hospital with which it is associated.[18]See St. Elizabeth Hosp., Inc. v. City of Appleton, 141 Wis.2d 787, 416 N.W.2d 620, 622-23 (App. 1987) (property exempt if "reasonably necessary" to efficient functioning of hospital).

4. Quantifying "Gift"
The assessors' most strenuous objection is to the Tax Commission's fifth standard, which attempts to measure an institution's "total gift to the community." Under standard V, the hospital must enumerate and total the various ways in which it provides unreimbursed service to the community according to measurement criteria set forth in the standard. For example, the value of unreimbursed care to indigent patients must be measured by the hospital's normal billing rates, reduced by the average of reductions afforded to all patients who are not covered by government entitlement programs, plus expenses directly associated with special indigent clinics. In this manner, the quantifiable portions of the "gift" are totaled, and to be eligible for a charitable exemption, this total must exceed, on an annual basis, what would otherwise be the hospital's property tax liability for the year.
The assessors contend that this standard distorts the concept of "charity" because it allows nonprofit hospitals to pass on the costs associated with providing charitable care to patients, insurance companies, and government assistance programs. Specifically, a hospital can charge patients who have the ability to pay a fee sufficient to recover *889 the cost of providing charitable care.[19] Thus, the assessors argue that the Tax Commission's standard is deficient because a community can pay  through patient charges and federal, state, and local taxes  the entire operating budget of a hospital utilizing cost-shifting rates and yet the hospital can claim a charitable gift to the community of an equal amount. We have held, however, that "[a]n organization or institution may still qualify for a tax exemption even if some charges are made to the recipients ... to help cover operating expenses, as long as these charges are not commensurate with the benefits provided." Yorgason, 714 P.2d at 660.
Moreover, the hospitals provide a gift to the community by lessening the community's health care burden.[20] If these hospitals did not provide indigent care, the community would presumably provide for it in some other way.[21] In this sense, IHC hospitals ease the community's burden by channeling funds, both donations and fees for services, to provide indigent care.

C. Tax Commission Authority and the Need for Uniform Standards
Each of the aforementioned standards parallels or complements the factors established in Utah County.[22] The Tax Commission did not exceed its authority by promulgating a set of uniform standards governing charitable exemptions. The Tax Commission has an express constitutional *890-894 duty to "administer and supervise the tax laws of the State." Utah Const. art. XIII, § 11. It is also mandated by statute to adopt rules and regulations governing county boards in the assessment, equalization, and collection of taxes. Utah Code Ann. § 59-1-210 (1992). The administrative difficulties experienced by the taxing authorities required the Tax Commission to adopt uniform standards to ensure equal treatment of all entities seeking charitable exemptions.
This court has consistently upheld the Tax Commission's authority to carry out its responsibilities in furthering its constitutional and statutory mandate. See, e.g., Mountain States Tel. & Tel. Co. v. Garfield County, 811 P.2d 184, 190 (Utah 1991) (observing that "the tax commission, under article XIII, has to a large degree assumed control over the local administration of the property tax system"); see also Friendship Manor Corp. v. State Tax Comm'n, 26 Utah 2d 227, 487 P.2d 1272, 1276 (1971) (noting that "Tax Commission can direct county officials to assess property as taxable property even though county officials have concluded it was property exempt from taxation under Constitution"). Because the standards promulgated by the Tax Commission conform to the constitutional requirements of article XIII, section 2 as previously interpreted by this court, we conclude that the Tax Commission acted in accordance with its charge to administer and supervise the state tax laws and was well within the bounds of its authority in adopting the charitable exemption standards.

III. CONCLUSION
We hold that the Tax Commission's standards are constitutional because they comply with the factors previously articulated by this court for granting a charitable use property tax exemption. Accordingly, we affirm the Tax Commission's grant to IHC of charitable exemptions which were made in accordance with these standards.
ZIMMERMAN, C.J., STEWART, Associate C.J., and HOWE and DURHAM, JJ., concur.
Gregory K. ORME, Court of Appeals Judge, sat to fill the vacancy on the court.
NOTES
[1] Article XIII, section 2 reads in relevant part:

(1) All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law.
(2) The following are property tax exemptions:
. . . .
(c) Property owned by a nonprofit entity which is used exclusively for religious, charitable or educational purposes.
Utah Const. art. XIII, § 2.
[2] We determined that Utah Code Ann. §§ 59-2-30 and -31 (1974) unconstitutionally expanded the scope of the tax exemption for charitable use granted by article XIII, section 2 of the Utah Constitution. Utah County v. Intermountain Health Care, Inc., 709 P.2d 265, 278 (Utah 1985). Specifically, we determined that these statutes, which focused exclusively on an institution's nonprofit status, do not ensure "the element of gift to the community, which an entity must demonstrate in order to qualify as a charity under our Constitution." Id. at 276. Utah Code Ann. § 59-2-30 (1974) stated:

This section is intended to clarify the scope of exemptions for property used exclusively for either religious worship or charitable purposes provided for in section 2 of Article XIII of the Constitution of the state of Utah. This section is not intended to expand or limit the scope of such exemptions. Any property whose use is dedicated to religious worship or charitable purposes including property which is incidental to and reasonably necessary for the accomplishment of such religious worship or charitable purposes, intended to benefit an indefinite number of persons is exempt from taxation if all the following requirements are met:
(1) The user is not organized to produce a profit from the use of the property.
(2) No part of any net earnings, from the use of the property, inures to the benefit of any private shareholder or individual, but any net earnings shall be used directly or indirectly, for the charitable or religious purposes of the organization.
(3) The property is not used or operated by the organization or other person so as to benefit any officer, trustee, director, shareholder, lessor, member, employee, contributor, or any other person through the distribution of profits, payment of excessive charges or compensations.
(4) Upon the liquidation, dissolution, or abandonment of the user no part of any proceeds derived from such use will inure to the benefit of any private person.
Utah Code Ann. § 59-2-31 (1974) stated:
Property used exclusively for religious, hospital, educational, employee representation, or welfare purposes which use complies with the requirements of section 59-2-30, shall be deemed to be used for charitable purposes within the exemption provided for in section 2 of Article XIII of the Constitution of the state of Utah, and section 59-2-30.
[3] A county board of equalization, consisting of the board of county commissioners, sits within each county of the state. Utah Const. art. XIII, § 11. These boards of equalization are endowed with the responsibility to "adjust and equalize the valuation and assessment of the real and personal property within their respective counties, subject to such regulation and control by the State Tax Commission as may be prescribed by law." Id.; see Utah Code Ann. § 59-2-1001 (1992).
[4] In Yorgason v. County Bd. of Equalization, 714 P.2d 653 (Utah 1986), we applied the factors established in Utah County, 709 P.2d at 269-70, and concluded that the Tax Commission and the district court were correct in recognizing that an apartment building that housed needy families was entitled to a charitable use exemption. Yorgason, 714 P.2d at 657-60.
[5] Utah Code Ann. § 17-5-1 (1991) requires that each board of county commissioners consist of three members.
[6] Moreover, subsequent to the decision in Utah County, IHC has made significant efforts to inform patients and the public that the hospitals provide care to all those in need without regard to ability to pay. Since 1988, IHC has distributed an annual report to over 350,000 households in Utah describing the nature of its charitable services. Signs placed throughout the hospitals advise patients and the public that the hospitals "provide charity care or other assistance to those in medical need."
[7] Several of IHC's urban hospitalsLDS Hospital, Cottonwood Hospital, and Alta View Hospital  operate clinics in central city and poor neighborhoods to assist indigent people with their primary health care needs. Since the subject exemption applications were filed in early 1991, Logan Regional Hospital and Utah Valley Regional Medical Center have also opened indigent-care clinics in low income neighborhoods. These clinics operate on a walk-in basis and provide free care to people of all ages. Indigent people with serious medical problems are referred directly to an IHC hospital for free hospital care.
[8] Such costs properly include a proportional share of the hospitals' costs attributable to research and tertiary care and are not limited to the out-of-pocket expense directly attributable to indigent care.
[9] Additionally, IHC contends that the assessors lack standing to challenge the standards promulgated by the Tax Commission. We decline to consider this argument.
[10] The statutes at issue in Utah County allowed a charitable use exemption based solely on an organization's status as a nonprofit entity. 709 P.2d at 267 n. 1; see supra note 2. We ruled that by focusing only on an institution's organizational and financial framework, one risks missing the more central question of whether the institution has bestowed a gift on the community. Utah County, 709 P.2d at 278-79.

Justices Stewart and Howe dissented in Utah County and would have upheld the constitutionality of the aforementioned statutes. They concluded that IHC's hospitals were entitled to the exemptions even under that less rigorous scheme. Id. at 294, 303. IHC, however, does not ask us to reconsider, much less overrule, Utah County. Accordingly, there is no need in this case to revisit the debate that divided the court in that case.
[11] The Tax Commission standards, as is hereafter explained, meet the minimum requirements of Utah County. The Tax Commission, therefore, has not expanded the scope of the exemption beyond what is constitutionally permitted. IHC does not claim that the standards are overly burdensome so as to unduly restrict the exemption. Therefore, the question of whether the Tax Commission standards are more restrictive than is constitutionally permissible is not before the court.
[12] The other five standards address the central question of what constitutes "charity." Specifically, these other standards attempt to define and quantify what constitutes a "gift to the community." For example, standards II, III, and IV attempt to ensure that charitable exemptions are awarded only to applicants that can demonstrate that (1) their services inure to the public's benefit; (2) access to medical care is provided regardless of race, religion, gender, or ability to pay; and (3) their policies reflect the public interest.
[13] Again, the assessors' contention is somewhat wide of the mark because they fail to recognize that no single standard is determinative in deciding whether to grant a charitable exemption. Rather, the Tax Commission requires each applicant to comply with the criteria outlined in all six of the standards.
[14] Moreover, 26 U.S.C. § 501(c)(3) (1986) does not serve as a lesser standard which applicants would find easy to overcome; rather, the Tax Commission incorporated section 501(c)(3) to serve as an objective measurement by which applicants could be judged. Thus, by using federal law in this context, the Tax Commission achieved its stated purpose in devising the standards: to provide an objective but relatively simple framework to determine property tax exemptions for hospitals and nursing homes. Given the objective criteria established in section 501(c)(3) to determine whether an applicant uses its net earnings and donations in a manner consistent with the intent of a charitable exemption, standard II properly serves as a constitutional guideline.
[15] Standard II, proscribing self-inurement, reflects this court's view that in making an exemption decision, the Tax Commission must consider "whether dividends or some other form of financial benefit, or assets upon dissolution, are available to private interests, and whether the entity is organized and operated so that any commercial activities are subordinate to or incidental to charitable ones." Utah County, 709 P.2d at 269-70.
[16] See supra note 6 (discussing IHC's significant efforts to inform patients and the public of its hospitals' open-access policy).
[17] Similarly, the central offices support and advance the purposes of the hospitals which they serve.
[18] In support of their position, the assessors cite Parker v. Quinn, 23 Utah 332, 64 P. 961 (1901). Parker stands for the proposition that "[w]here... a portion of certain property owned by a charitable institution is occupied and used by it for charitable purposes, and the other portion thereof is devoted to purposes of revenue, the portion used and occupied for charitable purposes is exempt, and the portion not so used and occupied is subject to taxation." 23 Utah at 333, 64 P. at 962. However, in Parker, the property itself was distinctly divided between charitable and commercial use. Id. Such is not the case here, as the satellite facilities are closely integrated with the hospitals' charitable mission.

Moreover, because the satellite facilities in question are directly related to the hospitals' mission, we do not reach the question of whether a commercial enterprise with a more tenuous relationship to an exempt hospital could share in that hospital's exemption. Other jurisdictions have held, however, that parking lots and office space reasonably necessary for the functioning of the hospital are exempt if the hospital is exempt. See, e.g., Northwestern Memorial Found. v. Johnson, 141 Ill.App.3d 309, 95 Ill.Dec. 688, 691, 490 N.E.2d 161, 164 (1986) (parking lot run in connection with tax-exempt hospital also found to be tax-exempt); Hotel Dieu v. Williams, 410 So.2d 1111, 1112 (La.1982) (office building and parking garage used for hospital purposes found to be exempt); Methodist Hosps. v. Assessment Appeals Comm'n, 669 S.W.2d 305, 307 (Tenn.1984) (nonprofit hospital's parking lot exempt as essential and integral part of hospital); Medical Ctr. Hosp. v. City of Burlington, 152 Vt. 611, 566 A.2d 1352, 1359 (1989) (upholding tax-exempt status of real property devoted to parking for employees and patients, to offices for anesthesiologists, radiologists, and hospital data processing, and to laboratories).
[19] The assessors principally take issue with using a hospital's billing rates as the starting point for determining the value of charitable care. The flexibility of billing rates and the ability of hospitals to shift rates are at the core of the assessors' criticism. To support their claim that the standard is deficient, they propose the following hypothetical: Revenue Hospital has a budget of $1,000,000, with 1000 patients each receiving services of equal cost, each of whom pays in full. The average cost of service per patient at Revenue Hospital is $1000. Compare this with Charity Hospital, which also has a budget of $1,000,000 and treats 1000 patients, each of whom receives services of equal cost. However, at Charity Hospital, one-half of the patients receive charitable care. The assessors claim that Charity Hospital can recoup the cost of providing charitable care by billing the 500 patients with the ability to pay $2000 each. Thus, the assessors argue that the cost of providing charitable care is passed on to those individuals fortunate enough to possess the means to pay for their health care needs.

However, the assessors' hypothetical completely ignores market forces, i.e., the 500 patients able to pay will not go to Charity Hospital and pay double the cost for care; perhaps with direction from their insurers, they will go to Revenue Hospital and pay the lower rates available there. Moreover, the assessors again fail to recognize that to qualify for a charitable exemption, a hospital must meet all six of the standards. Among those standards is the requirement that the hospital organize and operate as a nonprofit entity. The funds that allow a nonprofit hospital to provide charitable care are not raised by overcharging some patients  a strategy the market would not tolerate  but are available largely because the nonprofit hospital does not have to generate profits with which to pay dividends to shareholders. Moreover, IHC's coffers are bolstered by donations, albeit at levels which are small compared to its overall revenue.
[20] A critical factor in determining whether the indigent care provided by the hospitals constitutes a gift to the community is the degree to which such care lessens the community's burden. Yorgason, 714 P.2d at 660. The assessors contend that the amount of free care provided to the indigent is de minimis in comparison to the amount of the wholly or partially reimbursed care provided by the hospitals. The lessening of the community's burden, however, can fairly be measured by the difference between the cost of the indigent care borne by the hospitals and the tax revenues that the community would realize by assessing the hospitals' property. The record clearly indicates that the hospitals' costs associated with providing indigent care far exceed the tax revenues that would be generated by assessing the hospitals' property. In this sense, the hospitals fulfill a charitable purpose and provide a gift to the community at a level well in excess of what the community would receive if the hospitals paid property taxes but left the community with increased responsibility to provide hospital care to the disadvantaged.
[21] See, e.g., Utah Code Ann. § 17-5-62 (1991 & Supp.1993) (granting counties power to assess tax for care of indigent sick and for construction and maintenance of hospitals in connection with this purpose); Utah Code Ann. § 17-5-64 (1991) (providing for designation of one county commissioner as commissioner of the poor to, inter alia, oversee their medical treatment) (repealed 1993, but in effect for tax years in question).
[22] This exact administrative scheme is not constitutionally compelled. Nothing in this opinion precludes the Tax Commission from refining the standards it applies when granting or denying a charitable exemption. Only the standards presently employed by the Tax Commission are before us.